PEOPLE v BERGMAN

Docket No. 320975. Submitted September 1, 2015, at Detroit. Decided
September 29, 2015, at 9:10 a.m. Leave to appeal denied 499 Mich
916.

Lisa Lynne Bergman was convicted by a jury in the St. Clair Circuit
Court of two counts each of second-degree murder, MCL 750.317;
operating a vehicle under the influence of intoxicating liquor or a
controlled substance (OUIL) causing death, MCL 257.625(4); and
operating a vehicle with a suspended license causing death, MCL
257.904(4), after the truck she was driving crossed the centerline
and collided with another truck, killing its driver (Russell Ward),
and his passenger. Although defendant's blood alcohol concentra-
tion was below the legal limit, she tested positive for therapeutic
amounts of various prescription drugs or their metabolites. The
court, Michael L. West, J., sentenced defendant as a second-
offense habitual offender to concurrent prison terms of 25 to 50
years each for the second-degree murder convictions and 5 to 22½
years for each conviction of OUIL and driving with a suspended
license. Defendant appealed as of right.

The Court of Appeals *held*:

1. The trial court did not abuse its discretion by excluding
evidence of intoxicants and controlled substances in Ward's
bloodstream. The evidence established that defendant's vehicle
crossed the centerline and struck Ward's truck head-on. There
was no evidence that Ward was not properly driving within his
marked lane or that his vehicle would not have safely passed
defendant had defendant not crossed the centerline in front of
Ward. Because there was no evidence that Ward did anything to
contribute to the accident, the challenged evidence was not
probative of an intervening or superseding cause that could have
broken the causal link between defendant's conduct and the
victims' deaths. An accident victim's inability to protect himself
and others from the consequences of another person's unexpected
introduction of a serious hazard does not constitute an interven-
ing cause severing the causal chain between a defendant and the
victim. Ward's intoxication was also not relevant to defendant's
argument that she did not have the requisite level of intent to
support her conviction of second-degree murder. The offense of

second-degree murder is committed when a defendant has knowledge of her own propensity to create a notably severe hazard when driving while intoxicated, and the victim's state of intoxication is irrelevant to the defendant's knowledge of her own susceptibility to hazardous driving.

2. The trial court did not violate defendant's right to due process of law by denying her motion for the appointment of a toxicology expert at public expense because she did not demonstrate a nexus between the need for an expert and the facts of her case. Defendant did not explain why she could not safely proceed to trial without her own expert, establish why the objective results of blood analysis might be unreliable, make an offer of proof that an expert could dispute the prosecution experts' opinions regarding the side effects of prescription medications and their contribution to impaired driving, or establish that expert testimony would have been likely to benefit her case. Accordingly, the trial court did not abuse its discretion by denying defendant's motion.

3. There was no error to review with regard to the denial of defendant's motion to appoint an investigator because defendant withdrew the motion before it was decided, thereby waiving the issue.

4. Defendant's convictions for multiple counts of second-degree murder, OUIL causing death, and driving with a suspended license causing death did not violate her constitutional protections against double jeopardy. The statutes governing second-degree murder and driving with a suspended license causing death enforce distinct societal norms, and their respective elements of malice and lack of a valid operator's license are distinctive to each. Similarly, the OUIL and suspended-license statutes enforce distinct societal norms, and their respective elements of intoxication while driving and lack of a valid operator's license are distinctive to each.

5. The trial court did not abuse its discretion by admitting evidence of defendant's other acts of driving unsafely under MRE 404(b)(1). Evidence of incidents in which defendant was passed out in her vehicle or was involved in an accident while impaired or while under the influence of or possessing prescription pills was properly admitted to show defendant's knowledge and absence of mistake, and was relevant to the malice element for second-degree murder because it was probative of defendant's knowledge of her inability to drive safely after consuming prescription substances. Because the prior incidents were minor in comparison to the charged offenses involving a head-on

collision that caused the deaths of two individuals, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice under MRE 403. The fact that defendant offered to stipulate that her license had been suspended did not render the other-acts evidence inadmissible because the evidence was relevant to prove the element of malice.

6. Defendant was not entitled to resentencing under *People v Lockridge*, 498 Mich 358 (2015), because facts found by the jury were sufficient to assess the minimum number of offense variable (OV) points necessary for defendant's score to fall in the cell of the sentencing grid under which she was sentenced. The trial court assessed 50 points for OV 3, which is appropriate when a victim was killed, the death resulted from the commission of a crime and the offense involved the operation of a vehicle, and the offender was under the influence of or visibly impaired by the use of alcoholic liquor, a controlled substance, or a combination of alcoholic liquor and a controlled substance. Each of these facts was necessarily found by the jury beyond a reasonable doubt because the jury found defendant guilty of second-degree murder, which requires the death of a victim, and the jury also found defendant guilty of OUIL causing death, which required the jury to find that defendant was operating a vehicle while under the influence of alcoholic liquor, a controlled substance, or other intoxicating substance or a combination thereof. The trial court also assessed 100 points for OV 9, which is appropriate when multiple deaths occurred. The jury found defendant guilty of two counts each of second-degree murder. Because more than 100 OV points could be sustained on the basis of facts found by the jury beyond a reasonable doubt, defendant could not establish prejudice from any error was therefore not entitled to resentencing or other relief.

Affirmed.

1. CONSTITUTIONAL LAW — DOUBLE JEOPARDY — SECOND-DEGREE MURDER — DRIVING WITH SUSPENDED LICENSE CAUSING DEATH.

A person may be convicted of second-degree murder and driving with a suspended license causing death without violating the constitutional protections against double jeopardy; the statutes governing these crimes enforce distinct societal norms, and their respective elements of malice and lack of a valid operator's license are distinctive to each (US Const, Am V; Const 1963, art 1, § 15; MCL 750.317; MCL 257.904(4)).

2. CONSTITUTIONAL LAW — DOUBLE JEOPARDY — OPERATING A VEHICLE UNDER
   THE INFLUENCE OF LIQUOR CAUSING DEATH — DRIVING WITH SUSPENDED
   LICENSE CAUSING DEATH.

   A person may be convicted of second-degree murder and operating
   a vehicle under the influence of liquor causing death without
   violating the constitutional protections against double jeopardy;
   the statutes governing these crimes enforce distinct societal
   norms, and their respective elements of intoxication while driving
   and lack of a valid operator's license are distinctive to each (US
   Const, Am V; Const 1963, art 1, § 15; MCL 257.625(4); MCL
   257.904(4)).

*Bill Schuette*, Attorney General, *Aaron D. Lindstrom*, Solicitor General, *Michael D. Wendling*, Prosecuting Attorney, and *Hilary B. Georgia*, Senior Assistant Prosecuting Attorney, for the people.

*Stuart G. Friedman* for defendant.

Before: TALBOT, P.J., and WILDER and FORT HOOD, JJ.

WILDER, J. A jury convicted Lisa Lynne Bergman of two counts each of second-degree murder, MCL 750.317; operating a vehicle under the influence of intoxicating liquor or a controlled substance (OUIL) causing death, MCL 257.625(4); and operating a vehicle with a suspended license causing death, MCL 257.904(4). The trial court sentenced defendant, as a second-offense habitual offender, MCL 769.10, to concurrent prison terms of 25 to 50 years each for the second-degree murder convictions, and 5 to 22½ years for each conviction of OUIL and driving with a suspended license. Defendant appeals as of right. We affirm.

I

Defendant's convictions arise from a two-vehicle collision in Kimball Township in St. Clair County

shortly before 2:00 a.m. on July 20, 2013. A witness to the scene of the accident testified that there was heavy rain and fog. Defendant was driving a Ford F-350 pickup truck in the eastbound lane of Lapeer Road when she crossed the centerline, veered into the westbound lane, and collided head-on with a GMC Sonoma S-10 pickup truck. Lieutenant Terpenning,[1] an expert in accident reconstruction, testified that there was "no question" in his mind that defendant's vehicle crossed the centerline into oncoming traffic. He did not observe anything to indicate that the S-10 pickup truck did anything improper or did "anything other than driv[e] down its intended lane of travel." The driver of the GMC truck, Russell Ward, and his passenger, Koby Raymo, both died from blunt traumatic injuries.

Defendant's blood alcohol concentration (BAC) was below the legal limit,[2] but she also tested positive for carisoprodol (trade name Soma, which is a muscle relaxant and not an opiate), meprobamate (the active metabolite of carisoprodol), oxycodone, and amphetamine. Although the levels of these drugs in her system were within the therapeutic range,[3] Dr. Michele Glinn, an expert in forensic toxicology and the effect of drugs and alcohol on the human body, testified that the drugs, other than amphetamine, were central nervous system depressants and combining them could mag-

---

[1] Lieutenant Terpenning's first name does not appear in the record.

[2] Defendant's BAC measured from blood samples taken at the hospital after the accident was 52 milligrams per deciliter (0.052 grams per 100 milliliters). There was testimony that this would be equivalent to a ".04 whole blood result[]." The sample measured by the State Police revealed a BAC of 0.01 grams per 100 milliliters.

[3] According to expert testimony, defendant's carisoprodol level was within the therapeutic range and her meprobamate level was possibly within the therapeutic range, although the expert could not say for certain.

nify the effects and keep the drugs in the system longer. Glinn testified that, in particular, alcohol and Soma are a "bad combination." In Glinn's opinion, the drugs in defendant's system affected her ability to operate a motor vehicle.

At trial, over defendant's objection, the prosecution presented evidence of seven prior incidents in which defendant drove erratically, was passed out in her vehicle, or struck another vehicle while impaired or under the influence of prescription substances, such as carisoprodol or Soma, or was in possession of pills, such as Vicodin or Soma.[4] This evidence was offered for its relevance to the malice element of second-degree murder because it was probative of defendant's knowledge of how her substance abuse impaired her driving. Glinn opined that the current accident was the only incident in which defendant used alcohol in combination with other drugs.

Before trial, the prosecutor filed notice of its intent to introduce evidence of defendant's prior acts under MRE 404(b). The prosecutor asserted that defendant's prior conduct showed that she knew that consuming drugs and alcohol impaired her ability to safely operate a vehicle, and the evidence was relevant to prove the necessary element of malice for second-degree murder. Defendant moved to exclude evidence of her prior acts and to strike the prosecutor's filing of notice. She argued that the police reports filed with the prosecutor's notice of intent were inadmissible hearsay, and she contended that the filing of these reports would give the media access to unproven charges and deprive her of a fair trial. Defendant further argued that the prior incidents were not admissible under MRE 404(b)

---

[4] This other-acts evidence is discussed more fully in Part VI of this opinion.

because the court rule was intended to apply only to preplanned criminal activity, not to unintentional conduct. Lastly, defendant argued that if the prior incidents were admitted, she would lose her right to have her guilt or innocence determined on the facts of the case. She asserted that a limiting instruction would not be sufficient to prevent any prejudice.

The prosecutor argued that in all of the prior incidents, defendant had carisoprodol, or Soma, and its metabolite, meprobamate, in her system.[5] In a majority of the cases, defendant had hydrocodone (Vicodin) in her system. The instant case involved the opiate oxycodone (Oxycontin). In all but one prior incident, defendant was in possession of various pills, including Soma and Vicodin. The prosecutor argued that these incidents established a pattern of behavior in which defendant ingested controlled substances and drove her vehicle, despite knowing the risk of doing so. The prosecutor also argued that defendant's persistence in this pattern clearly demonstrated a lack of mistake or accident, and showed that she knowingly engaged in behavior that created a high risk of death or serious harm to others. As such, the prosecutor contended, the evidence was relevant to prove the requisite degree of malice for second-degree murder.

At the hearing on this motion, defendant argued that the "gratuitously filed" police reports filed in this matter should be struck. Defendant argued that if the prosecutor was permitted to introduce evidence of the other cases, "we will be fighting . . . perhaps up to five simultaneous cases all at the same time in the Circuit

---

[5] Contrary to the prosecutor's argument below, the evidence at trial did not establish that defendant was under the influence of Soma during the January 1, 2008 incident, although she was in possession of Soma pills.

Court," which would result in a "prejudicial effect . . . beyond any possible curative jury instruction[.]" Defendant argued that knowledge, accident, and absence of mistake were irrelevant when there was no allegation that defendant committed an intentional act. The trial court denied the defendant's motion, concluding that knowledge and absence of mistake were at issue and the prosecutor had a legitimate purpose in admitting the evidence "to show that this particular Defendant had knowledge of how these particular drugs affect her and how it affects her ability to drive . . . ." The trial court agreed to give a cautionary instruction if requested.

Defendant also moved for appointment of an expert witness at public expense. She argued that the accuracy and interpretation of the State Police laboratory tests were critical issues in the case, and claimed that she would be deprived of a "meaningful defense" unless an independent expert determined the accuracy and relevance of the "purported findings" in the laboratory reports. The cost of an independent examination of each test result was $1,500. A retest of what defendant referred to as "Sample B" was $760. Defendant argued that, at a minimum, she required an expert evaluation of her blood test results on the night of the fatal collision and the Sample B blood draw. She asserted that she was indigent and unable to pay these costs.

The prosecutor argued in response that the prosecutor's endorsement of an expert witness does not automatically entitle an indigent defendant to a court-appointed expert. Defendant also failed to allege any irregularity or deficiency with respect to the State Police Crime Lab's methods or protocols that would establish a genuine need for a defense expert.

At the hearing on this motion, defense counsel stated that he needed an expert to advise him on reviewing the toxicology reports and the "B sample." He explained that two samples are taken: the A sample, which is analyzed by the forensic lab, and the B sample, which is reserved for later testing. He asserted that the prosecutor could not reasonably argue that toxicology reports were relevant to the prosecution's case, but not relevant to the defense. The prosecutor responded that defendant's motion did not include arguments about relevance and interpretation of lab results. Rather, defendant's motion was based on reviewing methods and protocols to ensure that the State Police Crime Lab used proper methods, and a defendant is not entitled to an expert merely because the prosecutor relies on an expert, but instead must establish a "sufficient nexus" between appointment of an expert and a potential flaw in the prosecution's expert evidence. Defense counsel replied that he could not determine whether protocols were followed. The trial court stated that the prosecutor was making every effort to provide the "instrumental data" to the defense for review and analysis. The trial court agreed with the prosecutor that defendant had not established a sufficient nexus justifying further testing or duplicate testing to see if the same result would be obtained. The court indicated that it was unwilling to appoint at public expense an expert to duplicate the prosecution's forensic testing, but it did not rule out the appointment of a consultant-type expert to assist in reviewing the existing data and materials from the prosecution.

Also before trial, defendant moved for appointment of an investigator "to interview witnesses who were in a position to observe the defendant prior to and immediately following the collision." Defendant needed the investigator because defense counsel's attempts to per-

form an investigation had not yet yielded results. Defendant subsequently withdrew this motion after the trial court granted an adjournment of trial to allow defense counsel more time for preparation.

In another pretrial motion, the prosecutor sought to exclude evidence of the deceased victims' toxicology reports. The prosecutor noted that Ward's toxicology report indicated that he had a BAC of 0.054 grams per 100 milliliters, and 6.2 nanograms per milliliter of delta-9 tetrahydrocannabinol (THC) and 17 nanograms per milliliter of delta-9 carboxy THC in his bloodstream. His passenger, Koby Raymo, had a BAC of 0.110 grams per 100 milliliters, and also 7.5 nanograms per milliliter of delta-9 THC and 10 nanograms per milliliter of delta-9 carboxy THC in his bloodstream. The prosecutor argued that this evidence should be excluded because it was not relevant and it was unduly prejudicial. Raymo's toxicology results were irrelevant because he was a passenger and could not have contributed to the accident. Ward's toxicology results were irrelevant because the evidence clearly established that defendant crossed the centerline and struck Ward's vehicle head-on, with no negligence by Ward. Finally, the prosecutor argued that any probative value of the evidence was outweighed by the danger of unfair prejudice, misleading the jury, and confusion of the issues.

Defendant argued in response that Ward's toxicity levels were relevant to the issues of fault and causation. At the hearing on the motion, defense counsel argued that the other driver had "therapeutic levels" of the opiate pain reliever Tramadol and benzodiazepine. The trial court excluded the evidence on the basis that there was no legitimate question of fact regarding the proximate cause of the accident. At trial, defense counsel conducted voir dire examination of Dr. Mary

Pietrangelo, the deputy medical examiner who per-
formed autopsies on Ward and Raymo, in order to
create a record of excluded testimony. Pietrangelo
testified that Ward's ethanol level was below the legal
limit, his level of Tramadol (a pain medication) was
within a therapeutic dosage, and he had been exposed
to marijuana or a similar substance, but she could not
determine the level of exposure. Pietrangelo ruled out
those substances as contributing factors to his manner
of death. Defense counsel then renewed his motion to
admit Ward's toxicology results. He argued that they
were relevant to show that Ward was unable to remain
alert and react to sudden emergencies. The trial court
stated that if Ward's conduct was a factor in the
proximate cause of his death, "that does not necessar-
ily negate or nullify the conduct of Ms. Bergman if the
facts support what it is that she's being accused of."
The trial court concluded that in order for such evi-
dence to be potentially admissible, there would have to
be something "fairly substantial in terms of the detail
of this accident that would suggest that Mr. Ward was
somehow a cause of the accident." While the trial court
did not rule out admitting the evidence of Ward's
toxicology after development of the testimony, it was
never admitted.

After the prosecution rested its case, defendant
moved for a directed verdict regarding the two second-
degree-murder charges. The trial court denied the
motion.

The jury found defendant guilty of both counts of
second-degree murder, both counts of OUIL causing
death, and both counts of driving with a suspended
license causing death. At sentencing, defendant ob-
jected to the scoring of 50 points for offense variable
(OV) 3, but the trial court found that 50 points were

properly assessed. Defendant also objected to the scoring of OV 9, but the trial court found that 100 points were properly assessed. Defendant objected to the scoring of 25 points for OV 6, but the trial court found that the assignment of 25 points was proper. Next, defendant objected to the scoring of 25 points for OV 13, and the trial court agreed that it should be scored at zero points. Defendant argued that OV 17 should be scored at zero points and the prosecution agreed. According to the sentencing information report, OV 5 was scored at 15 points, and OV 18 was scored at five points. Defendant's total OV score was 195 points, and her prior record variable (PRV) score was 37 points, placing her in OV level III (100+ points) and PRV level D (25-49 points) of the applicable sentencing grid, MCL 777.61. The trial court concluded from these scores that defendant's sentencing guidelines range was 270 to 562 months or life, as enhanced for a second-offense habitual offender, and sentenced defendant to concurrent prison terms of 25 to 50 years each for the second-degree murder convictions, and 5 to 22½ years for each conviction of OUIL causing death and driving with suspended license causing death.

II

Defendant first contends that the trial court erred by excluding evidence of intoxicants and controlled substances in the bloodstream of Ward, the driver of the other vehicle, on the basis that the evidence was relevant to establishing that Ward may have been negligent and that defendant's own conduct did not rise to the level of depraved indifference for human life. We disagree.

We review preserved claims of evidentiary error for an abuse of discretion. *People v Unger*, 278 Mich App

210, 216; 749 NW2d 272 (2008). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *Id.* at 217.

"Generally, all relevant evidence is admissible at trial," and "[e]vidence which is not relevant is not admissible." *People v Powell*, 303 Mich App 271, 277; 842 NW2d 538 (2013) (quotation marks and citations omitted); see also MRE 402. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401; see also *People v McLaughlin*, 258 Mich App 635, 665; 672 NW2d 860 (2003). "Relevance involves two elements, materiality and probative value. Materiality refers to whether the fact was truly at issue." *People v Benton*, 294 Mich App 191, 199; 817 NW2d 599 (2011) (quotation marks and citation omitted). Evidence is probative if it "tends to make the existence of any fact that is of consequence of the determination of the action more probable or less probable than it would be without the evidence[.]" *People v Feezel*, 486 Mich 184, 197; 783 NW2d 67 (2010) (opinion by CAVANAGH, J.) (quotation marks and citation omitted).

In *Feezel*, the defendant struck and killed a pedestrian with his car. In dark and heavily rainy conditions, the victim was walking in the middle of an unlit, five-lane road, with his back to oncoming traffic. The victim was "extremely intoxicated" at the time of the accident with a blood alcohol content of 0.268 grams per 100 milliliters of blood, or higher. The defendant's blood alcohol content was 0.091 to 0.115 grams per 100 milliliters, and marijuana was detected in his blood. *Feezel*, 486 Mich at 188-189 (opinion by CAVANAGH, J.).

The defendant was charged with failing to stop at the scene of an accident that resulted in death, MCL 257.617(3); operating while intoxicated, second offense, MCL 257.625(1); and operating a motor vehicle with the presence of a controlled substance in his body, causing death, MCL 257.625(4) and (8). *Id*. at 187-188. The defendant argued on appeal that the trial court abused its discretion by granting the prosecutor's motion in limine to preclude evidence related to the victim's intoxication. *Id*. at 189, 191. Our Supreme Court concluded that the evidence was relevant to the issue of causation. *Id*. at 191. The Court reviewed the concept of proximate cause, observing:

> Proximate causation "is a legal construct designed to prevent criminal liability from attaching when the result of the defendant's conduct is viewed as too remote or unnatural." If the finder of fact determines that an intervening cause supersedes a defendant's conduct "such that the causal link between the defendant's conduct and the victim's injury was broken," proximate cause is lacking and criminal liability cannot be imposed. Whether an intervening cause supersedes a defendant's conduct is a question of reasonable foreseeability. Ordinary negligence is considered reasonably foreseeable, and it is thus not a superseding cause that would sever proximate causation. In contrast, "gross negligence" or "intentional misconduct" on the part of a victim is considered sufficient to "break the causal chain between the defendant and the victim" because it is not reasonably foreseeable. Gross negligence, however, is more than an enhanced version of ordinary negligence. "It means wantonness and disregard of the consequences which may ensue . . . ." "Wantonness" is defined as "[c]onduct indicating that the actor is aware of the risks but indifferent to the results" and usually "suggests a greater degree of culpability than recklessness . . . ." Therefore, while a victim's negligence is not a defense, it is an important factor to be considered by the

trier of fact in determining whether proximate cause has
been proved beyond a reasonable doubt. [*Id.* at 195-196
(citations omitted).]

The Court concluded that, because the prosecution
was required to prove the element of causation beyond a
reasonable doubt, evidence of the victim's BAC was
material. *Feezel*, 486 Mich at 198 (opinion by CAVANAGH,
J.). The Court held that the evidence was "highly
probative of the issue of gross negligence, and there-
fore causation, because the victim's intoxication would
have affected his ability to perceive the risks posed by
his conduct and diminished his capacity to react to the
world around him." *Id.* at 199. The Court acknowl-
edged that "being intoxicated, by itself, is not conduct
amounting to gross negligence." *Id.* However, examin-
ing the specific circumstances of that case, the Court
determined that "the proffered superseding cause was
the victim's presence in the middle of the road with his
back to traffic at night during a rain storm with a
sidewalk nearby." *Id.* Accordingly, "the proofs were
sufficient to create a jury-submissible question about
whether the victim was grossly negligent, and the
victim's high level of intoxication would have aided the
jury in determining whether the victim acted with
'wantonness and a disregard of the consequences
which may ensue . . . .' " *Id.* (citation omitted). The
Court also importantly noted:

Depending on the facts of a particular case, there may be
instances in which a victim's intoxication is not suffi-
ciently probative, such as when the proofs are insufficient
to create a question of fact for the jury about whether the
victim was conducting himself or herself in a grossly
negligent manner. [*Id.* at 198-199.]

Applying *Feezel* to the instant case, we conclude that
the excluded evidence is not probative of an interven-

ing or superseding cause that could break the causal link between defendant's conduct and the victims' deaths. Unlike the pedestrian in *Feezel*, who unnecessarily placed himself in the path of oncoming traffic in conditions of poor visibility, there was no evidence that the victims in this case had placed themselves in a hazardous situation at the time of the collision. The evidence established that defendant's vehicle crossed the centerline and struck the GMC truck head-on. There was no evidence that Ward was not properly driving within his marked lane, or that Ward's vehicle would not have safely passed defendant if defendant had not crossed the centerline in front of Ward, presenting a serious and unexpected hazard. Thus, there was no evidence that Ward did anything that contributed to the accident in a way that would establish that he was negligent or grossly negligent and by his conduct was an intervening cause of the accident. Although defendant speculates that Ward's consumption of controlled substances impaired his ability to react and avoid the accident, a driver's failure to avoid a vehicle that suddenly crosses the median directly in the path of oncoming traffic does not constitute gross negligence breaking the causal link. An accident victim's inability to protect himself and others from the consequences of another person's unexpected introduction of a serious hazard does not constitute an intervening cause severing the causal chain between the defendant and the victim.

Defendant also argues that Ward's intoxication was relevant to her defense of the second-degree murder charge because it would have shown that she did not have the requisite level of intent. "[T]he relationship of the elements of the charge, the theories of admissibility, and the defenses asserted governs what is relevant and material." *Powell*, 303 Mich App at 277 (citation

and quotation marks omitted). The elements of second-degree murder are "(1) a death, (2) the death was caused by an act of the defendant, (3) the defendant acted with malice, and (4) the defendant did not have lawful justification or excuse for causing the death." *People v Smith*, 478 Mich 64, 70; 731 NW2d 411 (2007). "Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v Goecke*, 457 Mich 442, 464; 579 NW2d 868 (1998). "The prosecution is not required to prove that the defendant actually intended to harm or kill. Instead, the prosecution must prove the intent to do an act that is in obvious disregard of life-endangering consequences." *People v Werner*, 254 Mich App 528, 531; 659 NW2d 688 (2002) (quotation marks and citation omitted). In *Werner*, this Court addressed circumstances in which intoxicated driving resulting in a fatality rises to the level of second-degree murder:

> We also recognize that *Goecke* held that not every intoxicated driving case resulting in a fatality constitutes second-degree murder. However, the evidence in this case disclosed "a level of misconduct that goes beyond that of drunk driving." This is not a case where a defendant merely undertook the risk of driving after drinking. Defendant knew, from a recent prior incident, that his drinking did more than simply impair his judgment and reflexes. He knew that he might actually become so overwhelmed by the effects of alcohol that he would completely lose track of what he was doing with his vehicle. If defendant knew that drinking before driving could cause him to crash on boulders in front of a house, without any knowledge of where he was or what he was doing, he knew that another drunken driving episode

could cause him to make another major mistake, one that
would have tragic consequences. [*Werner*, 254 Mich App at
533 (citations omitted).]

Thus, the offense of second-degree murder is committed when the defendant has knowledge of *her* own propensity to create a notably severe hazard when driving while intoxicated, and the victim's state of intoxication is irrelevant to the defendant's knowledge of her own susceptibility to hazardous driving. We find no basis to depart from the intervening-cause analysis articulated in *Feezel* in a case such as this, a prosecution for second-degree murder, when the evidence does not support the theory that the victim broke the chain of causation stemming from the defendant's conduct. Accordingly, we conclude that the trial court did not abuse its discretion in excluding as irrelevant the evidence of Ward's alcohol and substance exposure.

III

Defendant next argues that she was denied due process of law and is entitled to a new trial because the trial court erroneously denied her motion for appointment of a toxicology expert at public expense. We disagree.

We review the trial court's decision whether to appoint an expert for an abuse of discretion. *People v Tanner*, 469 Mich 437, 442; 671 NW2d 728 (2003).

MCL 775.15 authorizes payment for an expert witness,
provided that an indigent defendant is able to show "that
there is a material witness in his favor within the jurisdiction of the court, without whose testimony he cannot
safely proceed to trial . . . ." If the defendant makes this
showing, the judge, "in his discretion," may grant funds

for the retention of an expert witness. A trial court is not compelled to provide funds for the appointment of an expert on demand.

To obtain appointment of an expert, an indigent defendant must demonstrate a nexus between the facts of the case and the need for an expert. It is not enough for the defendant to show a mere possibility of assistance from the requested expert. Without an indication that expert testimony would likely benefit the defense, a trial court does not abuse its discretion in denying a defendant's motion for appointment of an expert witness. [*People v Carnicom*, 272 Mich App 614, 617; 727 NW2d 399 (2006) (citations omitted).]

Defendant relies on *Ake v Oklahoma*, 470 US 68, 77; 105 S Ct 1087; 84 L Ed 2d 53 (1985) (quotation marks and citation omitted), in which the United States Supreme Court held that "[m]eaningful access to justice" and fundamental fairness require that indigent defendants be afforded, at state expense, the "basic tools of an adequate defense or appeal[.]" This Court recognized *Ake* in *People v Leonard*, 224 Mich App 569, 580-581; 569 NW2d 663 (1997), and still concluded that "a defendant must show a nexus between the facts of the case and the need for an expert." *Id.* at 582.

We conclude that *Ake* does not require appointment of a defense expert without a demonstration of a nexus between the need for an expert and the facts of the case. Here, defendant failed to establish the requisite nexus. She asserted that toxicology evidence was a critical part of the prosecution's case, but she did not explain why she could not safely proceed to trial without her own expert. See MCL 775.15. She did not establish why the objective results of blood analysis might be unreliable. She made no offer of proof that an expert could dispute the prosecution experts' opinions regarding the side effects of prescription medications

and their contribution to impaired driving. Defendant failed to establish that expert testimony would likely benefit her case. A mere possibility that the expert would have assisted the defendant's case is not sufficient. *Carnicom*, 272 Mich App at 617. Accordingly, the trial court did not abuse its discretion by denying defendant's motion.

IV

Defendant also argues that the trial court erred by denying her motion for appointment of an investigator. Although defendant moved for the appointment of a defense investigator, defendant withdrew the motion before it was decided. By voluntarily withdrawing her motion, defendant waived her right to a defense investigator. See *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (waiver is the intentional relinquishment or abandonment of a known right). A waiver extinguishes any error, leaving no error to review. *Id.*

V

Defendant next argues that her convictions for multiple counts of second-degree murder, OUIL causing death, and driving with a suspended license causing death in connection with the death of each victim violated her double jeopardy protections under the United States and Michigan Constitutions. US Const, Am V; Const 1963, art 1, § 15. We disagree.

Because defendant did not raise this double jeopardy issue in the trial court, review is limited to plain error affecting substantial rights. *People v Meshell*, 265 Mich App 616, 628; 696 NW2d 754 (2005). "The double jeopardy clauses of the United States and Michigan constitutions protect against governmental abuses for

both (1) multiple prosecutions for the same offense after a conviction or acquittal and (2) multiple punishments for the same offense." *People v Calloway*, 469 Mich 448, 450; 671 NW2d 733 (2003). "A dual prosecution and conviction of a higher offense and a lesser cognate offense are permissible where the Legislature intended to impose cumulative punishment for similar crimes, even if both charges are based on the same conduct." *Werner*, 254 Mich App at 535. In *Werner*, this Court squarely held that dual convictions for OUIL causing death and second-degree murder do not violate the double jeopardy clauses, explaining:

> In *People v Kulpinski*, 243 Mich App 8, 620 NW2d 537 (2000), this Court found no double jeopardy implications where a defendant was convicted of both OUIL causing death and involuntary manslaughter, MCL 750.321. Because the Legislature intended for the two statutes to enforce distinct societal norms, and because each statute contained an element not found in the other, the Court concluded that multiple punishments were permissible. *Id.* at 18-24; see also *People v Price*, 214 Mich App 538; 543 NW2d 49 (1995). This reasoning applies with equal force to dual convictions of second-degree murder and OUIL causing death. If the Legislature intended for the OUIL causing death statute to enforce societal norms that are distinct from the societal norms enforced by the involuntary manslaughter statute (grossly negligent conduct), it clearly also intended the OUIL statute to enforce societal norms other than those enforced by the second-degree murder statute (proscribing wanton conduct likely to cause death or great bodily harm). *Id.* at 543-544; *Kulpinski*, [243 Mich App] at 22-23. Moreover, the OUIL causing death statute and second-degree murder statute each contain an element not found in the other. The OUIL causing death statute includes the element of operating a motor vehicle with a specified blood alcohol level, but not the element of malice; the converse is true of the second-degree murder statute. *Price*, [214 Mich App] at 545-546; *Kulpinski*, [243 Mich App] at 23-24. Accordingly, defendant's convictions of both

> second-degree murder and OUIL causing death do not violate the Double Jeopardy Clauses. [*Werner*, 254 Mich App at 535-536.]

Although the *Werner* Court did not address double jeopardy concerns with respect to convictions of second-degree murder and driving with a suspended license causing death, or convictions of OUIL causing death and driving with a suspended license causing death, the analysis in *Werner* applies with equal force to these combinations of convictions. The statutes governing second-degree murder and driving with a suspended license causing death enforce distinct societal norms, and their respective elements of malice and lack of a valid operator's license are distinctive to each. See *Smith*, 478 Mich at 70; MCL 257.904(4). Similarly, the OUIL and suspended-license statutes enforce distinct societal norms, and their respective elements of intoxication while driving and lack of a valid operator's license are distinctive to each. See MCL 257.625(4); MCL 257.904(4).[6] Accordingly, defendant's multiple convictions do not violate the double jeopardy clauses.

VI

Defendant next argues that the trial court erred by admitting evidence of her prior acts under MRE 404(b)(1). We disagree.

We review the trial court's decision to admit evidence for an abuse of discretion. *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010). MRE 404(b)(1) prohibits "[e]vidence of other crimes, wrongs, or acts" to prove a defendant's character or propensity to commit the charged crime, but permits such evidence for other purposes, "such as proof of motive, opportunity,

---

[6] Defendant concedes that this Court is bound by *Werner*.

intent, preparation, scheme, plan, or system in doing
an act, knowledge, identity, or absence of mistake or
accident when the same is material . . . ." Evidence of
other crimes or bad acts is admissible when it is offered
for a proper purpose, MRE 404(b)(1); it is relevant
under MRE 402; and its probative value is not substan-
tially outweighed by unfair prejudice, MRE 403. *People
v VanderVliet*, 444 Mich 52, 74-75; 508 NW2d 114
(1993), amended 445 Mich 1205 (1994).

In *Werner*, 254 Mich App at 533-534, this Court held
that evidence that the defendant had previously expe-
rienced an alcohol-induced blackout while driving,
during which he "crash[ed] on boulders in front of a
house, without any knowledge of where he was or what
he was doing," was admissible under MRE 404(b)(1) in
a case in which the defendant was charged with
second-degree murder; OUIL causing death, OUIL
causing serious impairment of a body function; MCL
257.625(5); and driving with a suspended license, sec-
ond offense, MCL 257.904(1). This Court held that the
evidence was properly admitted to show knowledge
and absence of mistake, and was probative of the
malice element for second-degree murder because it
showed "that defendant knew that heavy drinking
could lead to a blackout, and that a blackout could lead
to defendant's driving without any understanding of
what he was doing." *Id.* at 539-540. The evidence also
was relevant because the defendant's previous black-
out while driving "made it more probable than not that
he was aware this could happen to him." *Id.* at 540.
This Court further concluded that the probative value
of the evidence outweighed any prejudicial effect be-
cause the prior incident involving a one-vehicle acci-
dent with no injuries to anyone was a minor incident in
comparison to the charged offense, in which the defen-
dant drove the wrong way on a freeway and caused the

death of a young woman and seriously injured a young man. In addition, the trial court gave an appropriate cautionary instruction. *Id.*

We conclude that *Werner* is directly on point. The prior acts evidence here involved incidents in which defendant either drove unsafely, was passed out in her vehicle, or was involved in an accident while impaired or under the influence of prescription substances, or was in possession of pills, such as Vicodin and Soma. This evidence was properly admitted to show defendant's knowledge and absence of mistake, and was relevant to the malice element for second-degree murder because it was probative of defendant's knowledge of her inability to drive safely after consuming prescription substances. And, because the prior incidents were minor in comparison to the charged offenses involving a head-on collision that caused the deaths of two individuals, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice under MRE 403. Lastly, the trial court gave an appropriate cautionary instruction to reduce any potential for prejudice.

We reject defendant's assertion that, under *Old Chief v United States*, 519 US 172; 117 S Ct 644; 136 L Ed 2d 574 (1997), there was no need to introduce the prior acts evidence because she could have stipulated that her license was suspended. In *Old Chief*, the United States Supreme Court held that the trial court abused its discretion in rejecting the defendant's offer to stipulate that he had a prior felony conviction, a necessary element of the charged offense of felon in possession of a firearm. *Id.* at 174. The Court observed that "evidence of the name or nature of the prior offense generally carries a risk of unfair prejudice to the defendant" and that the defendant's admission of a

prior conviction was not only sufficient to prove that element of the charged offense, but also was "seemingly conclusive evidence of the element." *Id.* at 185-186. The Court acknowledged that "the accepted rule that the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away rests on good sense," but reasoned that the "recognition that the prosecution with its burden of persuasion needs evidentiary depth to tell a continuous story has . . . virtually no application when the point at issue is a defendant's legal status, dependent on some judgment rendered wholly independently of the concrete events of later criminal behavior charged against him." *Id.* at 189-190.

In *People v Crawford,* 458 Mich 376, 378; 582 NW2d 785 (1998), our Supreme Court considered the admission of the defendant's prior conviction of possession with intent to deliver cocaine in his jury trial for possession with intent to deliver cocaine. Citing *Old Chief,* the Court concluded that the defendant's intent was in issue "[b]ecause the prosecution must carry the burden of proving every element beyond a reasonable doubt, regardless of whether the defendant specifically disputes or offers to stipulate any of the elements . . . ." *Crawford,* 458 Mich at 389. In *People v McGhee,* 268 Mich App 600, 610 n 3; 709 NW2d 595 (2005), this Court, citing *Crawford,* rejected the defendant's argument that the prosecutor should not be permitted to introduce prior acts evidence to prove that the defendant acted with the requisite intent to distribute drugs.

Here, defendant's offer to stipulate that she had a suspended license, while being conclusive of a necessary element for that offense, would not have been conclusive of or a sufficient substitute for the malice

element of second-degree murder, for which the evidence was offered. Proof that defendant intentionally acted "in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm," *Goecke*, 457 Mich at 464, is not a matter of legal status. Even a stipulation to the fact of prior charges or convictions would not have been conclusive of or a sufficient substitute for the malice element. Defendant's prior incidents revealed that she already had several close calls involving drug-impaired driving, and thus should have recognized that she could not safely drive while using drugs. Accordingly, the trial court did not abuse its discretion by admitting the other-acts evidence.

VII

Finally, relying on *Alleyne v United States*, 570 US ___; 133 S Ct 2151; 186 L Ed 2d 314 (2013), and *Apprendi v New Jersey*, 530 US 466; 120 S Ct 2348; 147 L Ed 2d 435 (2000), defendant argues that judicial fact-finding at sentencing was improperly used to score OVs 3, 7, 9, and 19,[7] and thereby increase the floor of the guidelines minimum sentence range, in violation of her Sixth Amendment right to a jury trial. We disagree.

In *Apprendi*, 530 US at 490, the United States Supreme Court announced the general Sixth Amendment principle that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." In *Alleyne*, 570 US at ___; 133 S Ct at 2155, the Supreme Court extended this rule to mandatory mini-

---

[7] We note that the trial court did not score OV 7 or 19.

mum sentences. The Court held that "any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." *Id.* at 133 S Ct at 2155.

In *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015), our Supreme Court recently addressed the application of the *Apprendi* and *Alleyne* rules to Michigan's sentencing guidelines. The Court concluded that Michigan's sentencing guidelines violate the Sixth Amendment to the extent that they allow a sentencing judge to find by a preponderance of the evidence facts that are used to score the offense variables and, thereby, to mandatorily increase the floor of the guidelines minimum sentence range. *Id.* at 399. To remedy this constitutional violation, the Court held that the guidelines are "advisory only." *Id.* The Court "sever[ed] MCL 769.34(2) to the extent that it is mandatory and [struck] down the requirement of a 'substantial and compelling reason' to depart from the guidelines range in MCL 769.34(3)." *Id.* at 391. The Court stated, however, that the guidelines remain "a highly relevant consideration in a trial court's exercise of sentencing discretion," *id.*, and that sentencing judges remain obligated to determine the applicable guidelines range and to take the guidelines range into account when imposing a sentence, *id.* at 392.

The *Lockridge* Court further clarified that when, as in this case, the defendant did not object to the scoring of the offense variables at sentencing on *Apprendi/Alleyne* grounds, review is for plain error affecting substantial rights. *Lockridge*, 498 Mich at 392. The Court also discussed how that standard is to be applied in other cases. As relevant to this case, the Court stated:

> First, we consider cases in which (1) facts admitted by the defendant and (2) facts found by the jury were suffi-

cient to assess the minimum number of OV points necessary for the defendant's score to fall in the cell of the sentencing grid under which he or she was sentenced. In those cases, because the defendant suffered no prejudice from any error, there is no plain error and no further inquiry is required. [*Id.* at 394-395.]

In this case, the trial court scored the sentencing guidelines for defendant's second-degree-murder conviction. Defendant's total OV score was 195 points and her PRV score was 37 points, placing her in OV level III (100+ points) and PRV level D (25-49 points). OV Level III is the highest level of offense severity on the applicable sentencing grid. MCL 777.61. Thus, as long as at least 100 OV points can be sustained on the basis of facts found by the jury beyond a reasonable doubt, defendant cannot establish prejudice from any error, and relief is not required. Defendant alleges that judicial fact-finding occurred in the scoring of OVs 3, 7, 9, and 19.[8]

The trial court assessed 50 points for OV 3, which is appropriate when (1) a victim was killed, (2) the "death results from the commission of a crime and the offense . . . involves the operation of a vehicle," and (3) "[t]he offender was under the influence of or visibly impaired by the use of alcoholic liquor, a controlled substance, or a combination of alcoholic liquor and a controlled substance." MCL 777.33(1)(b) and (2)(c)(*i*). Each of these facts was necessarily found by the jury beyond a reasonable doubt. The jury found defendant guilty of second-degree murder, which requires the death of a victim. The jury also found defendant guilty of OUIL causing death, which required the jury to find that defendant was operating a vehicle while under the

---

[8] She does not, however, challenge the accuracy of the scoring of those OVs.

influence of alcoholic liquor, a controlled substance, or other intoxicating substance or a combination thereof. MCL 257.625(1)(a). Thus, each of the facts necessary to support a 50-point score for OV 3 was necessarily found by the jury beyond a reasonable doubt. Accordingly, the trial court's scoring of OV 3 did not violate defendant's Sixth Amendment right to a jury trial.

The trial court also assessed 100 points for OV 9, which is appropriate when "[m]ultiple deaths occurred." MCL 777.39(1)(a). MCL 777.39(2)(b) indicates that 100 points are to be assessed only in homicide cases. The jury found defendant guilty of two counts each of second-degree murder. These verdicts reflect that the jury found beyond a reasonable doubt that multiple deaths occurred. Accordingly, the trial court's scoring of OV 9 did not violate defendant's Sixth Amendment right to a jury trial.

In sum, because facts found by the jury were sufficient to assess the minimum number of OV points necessary for defendant's placement in the D-III cell of the sentencing grid under which she was sentenced, there was no plain error and defendant is not entitled to resentencing or other relief under *Lockridge*.

Affirmed.

TALBOT, P.J., and FORT HOOD, J., concurred with WILDER, J.