*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JUDITH MARIA SOBOL,

        Defendant-Appellant.

UNPUBLISHED
September 19, 2024

No. 366349
Berrien Circuit Court
LC No. 2022-001854-FC

Before: N. P. HOOD, P.J., and O'BRIEN and REDFORD, JJ.

PER CURIAM.

Defendant appeals as of right her jury convictions of second-degree murder, MCL 750.317; and possession of methamphetamine, MCL 333.7403(2)(b)(*i*). The trial court sentenced defendant to serve concurrent sentences of 30 to 75 years' imprisonment for her second-degree murder conviction and 323 days' incarceration for her possession of methamphetamine conviction. On appeal, defendant challenges the sufficiency of the evidence supporting her second-degree murder conviction and asserts that her out-of-guidelines sentence for second-degree murder violates the principle of proportionality. For the reasons stated in this opinion, we disagree.

## I. BACKGROUND FACTS

This case arises from the death of three-year-old OM on June 20, 2022, after she was detached from her ventilator and deprived of oxygen. OM had a syndrome that caused facial paralysis, weakness in her upper body, and an inability to swallow. OM also had epilepsy; however, she had not experienced a seizure in the year before her death. OM was physically incapable of sitting up by herself, and she could only hold up her head for less than five minutes at a time. Because of a loss of digital dexterity, OM was unable to grab her toys, and she was unable to walk. OM was unable to communicate verbally, but she used other nonverbal methods. OM made physical improvements under her course of treatment, and she was expected to live a full life.

Because of her conditions, OM had a tracheostomy tube attached to a stoma in her neck. The tracheostomy tube connected her to a ventilator to facilitate her breathing. To prevent

-1-

decannulation,[1] the tracheostomy tube was fastened to OM's neck with tightly wrapped fabric and Velcro. The ventilator and tracheostomy tube were attached together using various components and adapters. If OM's tracheostomy tube detached, it would still be attached around her neck because of its Velcro ties, but the ventilator would automatically sound an alarm because it would detect an improper airflow. OM always needed to be connected to the ventilator to facilitate breathing. She also used a feeding tube and was connected to a pulse oximeter that would sound an alarm if her blood-oxygen levels dropped below a certain level.

OM lacked the strength to unfasten the Velcro from her tracheostomy tube. Moreover, OM tended to chew her fingernails off, so, to combat this, OM wore arm braces to prevent her from bending her arms at her elbows. OM's mother never observed OM remove the tracheostomy tube and never saw it dislodge from coughing. It would decannulate if OM rolled on her side, but the tracheostomy tube stopped detaching after it was resized to fit OM's growing body.

OM had home healthcare nursing between five or six days, and four or five nights, a week. Defendant, a nurse with a master's degree in nursing, had been OM's night nurse for approximately six to eight months at the time of OM's death. Her responsibilities included monitoring OM overnight, performing OM's tracheostomy routine, and administering treatment. Defendant's shifts at the time of the incident were 11:00 p.m. until 7:00 a.m.

On the night of June 19, 2022, OM had already been put to bed by approximately 8:30 p.m., which included, among other things, changing her tracheostomy ties and placing her arm braces. OM was attached to her ventilator, her tracheostomy tube was secured, all the necessary attachments were secured, and she was connected to her pulse oximeter. It was expected that defendant would arrive for her shift at 11:00 p.m., but she arrived an hour late, appearing frazzled and apologetic. OM's father updated defendant on OM's conditions, including the fact that her tracheostomy care routine had already been performed for the night, and he went to bed, leaving OM alone with defendant.

OM's mother awoke in the middle of the night, heard OM's alarms sounding, and proceeded to OM's bedroom. She saw defendant slumped in a chair mumbling to herself. OM's mother assumed that defendant was having a medical emergency. OM's mother then noticed that OM's tracheostomy tube was missing. OM's skin was pale, OM was cold to the touch, and she was not breathing. OM's parents began CPR and attempted to insert a different tracheostomy tube into OM, but they were unsuccessful because all the pieces to her ventilator were taken apart and thrown around the room. They called 911. Defendant began pulling items out of OM's medical "go bag" and was throwing the items; defendant was told to get out of the room. Defendant repeatedly stated that OM was dead, that she killed OM, and that her life was over, as she proceeded to hit her face into the living room floor.

Arriving paramedics found that OM's heart was beating only once every 10 to 15 seconds. Responding officers observed defendant in the fetal position with her hands behind her back, making erratic and furtive movements. One officer described defendant as appearing "possessed,"

---

[1] Decannulation occurs when the tracheostomy tube is dislodged from the stoma or plugged by mucus.

with her eyes wide, but her pupils pinpoint, indicating that she was on narcotics. Defendant stated, "I killed the baby, I'm no [sic] meth, I haven't slept in three days, take me away." Defendant admitted to responding officers that she had methamphetamine in her purse; officers searched defendant's purse and found drug paraphernalia, including two methamphetamine pipes, several syringe caps, and a crystalline substance. The pipes subsequently tested positive for methamphetamine. Defendant's blood was found to contain amphetamine and methamphetamine. A search of defendant's vehicle revealed a large number of syringes, which also tested positive for methamphetamine.

OM was pronounced deceased at the hospital. While OM's parents were saying their goodbyes to her, they found OM's missing tracheostomy tube tangled in the hair on the back of OM's head, with the Velcro unfastened. Both of OM's arm braces were still properly fastened until the paramedics removed them. The coequal causes of death were found to be complications of OM's medical conditions, with the manner of death as homicide.

During her interview with law enforcement, defendant could not remember what time she arrived at OM's residence or whether she took OM's tracheostomy tube out, and defendant asserted that she may have blacked out. At one point, defendant asserted that she thought that she was in a dream. Defendant admitted to using methamphetamine all week, coming down from a high, and using methamphetamine on the night of June 19, 2022.

Defendant was convicted and sentenced, as stated earlier. She now appeals.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant argues that there was insufficient evidence presented at trial to support a rational trier of fact concluding that her decision to take methamphetamine would likely result in OM's death or great bodily harm. We disagree. Given the evidence and testimony, and giving due deference to the trier of fact's ability to judge the credibility of witnesses, there was sufficient evidence to find defendant guilty of second-degree murder.

We review de novo defendant's challenge to the sufficiency of the evidence. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). "In determining whether sufficient evidence exists to sustain a conviction, this Court reviews the evidence in the light most favorable to the prosecution, and considers whether there was sufficient evidence to justify a rational trier of fact in finding guilt beyond a reasonable doubt." *People v Harris*, 495 Mich 120, 126; 845 NW2d 477 (2014). The prosecution "is not obligated to disprove every reasonable theory consistent with innocence to discharge its responsibility; it need only convince the jury in the face of whatever contradictory evidence the defendant may provide." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000) (quotation marks and citation omitted). "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018) (quotation marks and citation omitted). "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *Id*. (quotation marks, citation, and emphasis omitted).

The elements of second-degree murder are: (1) a death, (2) caused by the defendant, (3) with malice. *People v Spears (On Remand)*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 357848); slip op at 10.[2] "Second-degree murder is a general intent crime." *People v Fletcher*, 260 Mich App 531, 559; 679 NW2d 127 (2004) (citation omitted). The third element, malice, may be established in three ways: "by showing (1) the intent to kill, (2) the intent to cause great bodily harm, or (3) the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v Gafken*, 510 Mich 503, 511; 990 NW2d 826 (2022). The prosecution only argued the third theory of malice at trial. Under the third theory of malice, "[t]he prosecution is not required to prove that the defendant actually intended to harm or kill. Instead, the prosecution must prove the intent to do an act that is in obvious disregard of life-endangering consequences." *People v Bergman*, 312 Mich App 471, 487; 879 NW2d 278 (2015) (quotation marks and citation omitted).

Defendant argues that the evidence did not show that she knew taking methamphetamine would create a high probability that OM's death would occur. In support of this argument, defendant argues that there was no evidence that she intended to harm anyone or, specifically, to harm OM. As previously stated, the prosecution did not need to prove that defendant intended to harm or kill OM. See *Bergman*, 312 Mich App at 487. Instead, the question at issue is, when viewed in a light most favorable to the prosecution, did the prosecution present sufficient evidence for a rational trier of fact to find, beyond a reasonable doubt, that defendant acted in wanton and willful disregard of the likelihood that the natural tendency of her behavior would cause death or great bodily harm to OM. We conclude that the prosecution presented sufficient evidence that defendant committed second-degree murder.

It is undisputed that OM died; therefore, the first element of second-degree murder was satisfied. For the remaining elements, the prosecution's theory of the case was that defendant knowingly took methamphetamine and provided OM with improper care. Specifically, the prosecution argued that defendant herself removed OM's tracheostomy tube without replacing it or, alternatively, the tracheostomy tube decannulated and defendant, instead of reattaching the tracheostomy tube, threw components of the ventilation system around the room rendering it impossible for OM's parents to reconnect it to OM. Given her education and approximately eight months caring for OM overnight, the prosecution argued that defendant knew that OM could not breathe without the ventilation system.

The prosecution presented sufficient evidence that defendant caused OM's death. Defendant was alone in the room with OM immediately before OM's disconnection from the ventilator. Earlier that night, OM was attached to her ventilator, her tracheostomy tube was tightly secured, all the necessary attachments were secured, and she was connected to her pulse oximeter. OM was too weak and lacked the digital dexterity to undo the Velcro securing her tracheostomy tube. Additionally, OM's arm braces prohibited her from lifting her hands to her mouth, and the braces were properly fastened to OM's arms until the paramedics removed them. Although OM

---

[2] In *Spears*, this Court removed the fourth element of second-degree murder—"without justification or excuse"—holding that it is not a true element of the offense. *Spears (On Remand)*, ___ Mich App at ___; slip op at 10-15. Justification or excuse was not at issue in this case.

had experienced seizures in the past, she had not had one in approximately a year, and, regardless, those seizures had not previously dislodged her tracheostomy tube. OM's parents found her disconnected from her ventilator, with all the pieces to the ventilator taken apart and strewn around the room. OM's tracheostomy tube was later found tangled up in the hair on the back of her head, with the Velcro unfastened.

Taken together, this amounts to circumstantial evidence that defendant disconnected the tracheostomy tube and attachments to OM's ventilator, and scattered the attachments about the room, which caused OM to be unable to breathe given her conditions, causing her death. This evidence also supported the prosecution's alternate theory that the tracheostomy tube became dislodged on its own, and, rather than reattach the tracheostomy tube, defendant took the tube off and took apart the ventilator system, preventing others from reattaching OM to the ventilator. Therefore, the second element of second-degree murder was satisfied.

The third element—malice—was also satisfied in this matter. Malice may be established by showing "the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm," *Gafken*, 510 Mich at 511, or, stated differently, "the intent to do an act that is in obvious disregard of life-endangering consequences," *Bergman*, 312 Mich App at 487 (quotation marks and citation omitted), which "can be inferred from evidence that a defendant intentionally set in motion a force likely to cause death or great bodily harm," *People v Djordjevic*, 230 Mich App 459, 462; 584 NW2d 610 (1998).

It can be reasonably inferred that defendant was fully aware of OM's medical condition and the necessity of her remaining attached to the ventilation system because of her profession and the months she spent caring for OM. She knew the consequences if OM became disconnected from her ventilator. She knew she was the sole person charged with responding to a medical emergency when OM was under her supervision. Aware of the consequences, defendant came to work high on methamphetamine after three days without sleep. Regardless of whether defendant was experiencing the effects of methamphetamine use, or whether she was coming down from a high and experiencing hallucinations or extreme exhaustion from being awake for the preceding several days, she came to work in an unfit state, detached the tracheostomy tube, and took apart the ventilation system. Even under the prosecution's alternate theory that the tracheostomy tube became dislodged by accident; rather than reattaching the tracheostomy tube, record evidence supported that defendant removed the Velcro and threw the components of the ventilation system around the room. This rendered it impossible to reconnect OM to her ventilator and placed her life in immediate danger without oxygen. From the evidence in the record, it was reasonable for the jury to conclude that defendant acted in obvious disregard of life-endangering consequences to OM, a child with highly tailored medical needs, when she came to work high on methamphetamine and provided improper medical care. *Bergman*, 312 Mich App at 487. Accordingly, when viewed in the light most favorable to the prosecution, sufficient evidence was presented to justify a rational trier of fact in finding defendant guilty, beyond a reasonable doubt, of second-degree murder.

## III. UPWARD-DEPARTURE SENTENCE

Defendant next argues that her out-of-guidelines sentence for second-degree murder violates the principle of proportionality and that all the reasons for the sentencing departure stated by the trial court were already considered by the sentencing guidelines. We disagree.

"A sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness." *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015). "[T]he standard of review to be applied by appellate courts reviewing a sentence for reasonableness on appeal is abuse of discretion," which is established when the trial court imposes a sentence that is disproportionate "to the seriousness of the circumstances surrounding the offense and the offender." *People v Steanhouse*, 500 Mich 453, 459-460, 471; 902 NW2d 327 (2017) (*Steanhouse II*) (quotation marks and citation omitted). See also *Graham v Florida*, 560 US 48, 59; 130 S Ct 2011; 176 L Ed 2d 825 (2010). "The existence of a [factor supporting a sentencing departure] is a factual question reviewed for clear error on appeal." *People v Dixon-Bey*, 340 Mich App 292, 296; 985 NW2d 904 (2022) (*Dixon-Bey II*).

When evaluating an out-of-guidelines sentence, "the key test is whether the sentence is proportionate to the seriousness of the matter, not whether it departs from or adheres to the guidelines' recommended range." *Steanhouse II*, 500 Mich at 472 (quotation marks and citation omitted). An out-of-guidelines sentence is not presumed unreasonable. *Id*. at 474. When a trial court imposes an out-of-guidelines sentence, "a trial court must justify the sentence imposed in order to facilitate appellate review, which includes an explanation of why the sentence imposed is more proportionate to the offense and the offender than a different sentence would have been." *People v Dixon-Bey*, 321 Mich App 490, 525; 909 NW2d 458 (2017) (*Dixon-Bey I*) (quotation marks and citation omitted). As this Court has noted:

> A number of factors have been deemed appropriate to consider when determining the proportionality of a departure sentence, including the seriousness of the offense; factors not accounted for by the guidelines, such as the prior relationship between the victim and the defendant, a lack of remorse, or a low potential for rehabilitation; and factors accounted for by the guidelines but given inadequate weight under the circumstances. [*Dixon-Bey II*, 340 Mich App at 296.]

The extent of an out-of-guidelines sentence—not merely the departure itself—must also satisfy the principle of proportionality. *People v Milbourn*, 435 Mich 630, 660; 461 NW2d 1 (1990), abrogation recognized by *Steanhouse II*, 500 Mich at 471-472. However, "[a] departure sentence does not need to be arithmetically measured." *People v Lawhorn*, 320 Mich App 194, 211; 907 NW2d 832 (2017).

In this case, defendant's minimum sentencing guidelines range, after corrections were made to defendant's offense variables (OVs), was 180 to 300 months for her second-degree murder conviction. The trial court sentenced defendant to a minimum of 360 months in prison for her second-degree murder conviction, an upward departure of 60 months. At sentencing, the trial court stated in pertinent part:

As I indicated[,] the family entrusted the defendant with [OM's] care as a medical professional[,] not just a friend, not an acquaintance, not some—someone with just even some training or knowledge in the area, but someone who had a master's degree in nursing, and was hired for this very purpose, to make [OM] her sole responsibility for the eight or ten hours that you were there.

I know the doctors have an oath and it is[, "]do no harm.["]  I don't know if the same exists for nursing[,] but it has to be pretty close to the same, and certainly the goal is the same, to—to cure, to aid.  Okay.  In many ways what we might consider humanitarian jobs.

Your actions that night stand in opposite to all that nursing and medical care stands for.

They—those of us who were here heard the testimony, watched the video, this was at the very least an act of stunning neglect[,] but more so complete and total self-absorb—self-absorption and disregard for the life of [OM].

* * *

In this case it was at was [sic] absolutely your choice to go to work that day. It was your choice not to phone in sick.  It was your choice to use methamphetamine, and go to that house, and be left alone in the room with [OM]. You were on—high on meth.

The prosecutor has requested an upward departure from the guidelines and the court has to make sure that the principle of proportionality is met when sentencing.  For the most part[,] the prosecutor's arguments are found by this court to be valid.

Considering the first argument that [OM] was medically fragile.  Unlike most victims[,] first of all[,] she was a child, a three-year[-]old.  And three-year[-]olds cannot care for themselves.  They can't make decisions on their own.  But beyond that[,] she was in a medical condition where she needed constant care, 24[-]hour care.  And that's where you came in.  Just simply to allow the parents to do nothing more than sleep with peace of mind knowing that their daughter would be safe.

I do not think the guidelines as set forth here take the significant issues with [OM's] health into consideration.

Secondly, educ—education and training level of the defendant.  As I indicated already[,] the defendant not only holds a nursing degree[,] but a master's in nursing.  And specifically was hired to care for this patient and this patient only. And she let her down in the worst of ways.  Then third is basically covered with that.

Fourth[,] that the defendant had a drug addiction that was not factored into the guidelines. Whether or not to use meth is a choice. I say that without disregard for the fact that addiction is a problem and a disease. But you knew what you were doing. You did this intentionally and you said specifically, ["]I went there so I would not let the family down.["] There is no way that you can let them down more so than allow them to believe you were in a condition to care for their daughter when you absolutely were not. You could not care for yourself.

And anybody who uses methamphetamine knows that a nurse, and a nurse with a master's degree, should have a greater appreciation than probably almost anybody else how very dangerous that is, and the very high risk that you would pose. Driving the car to get over there alone, let alone being left alone with [OM].

\* \* \*

. . . I am taking into consideration those unique exceptions that I think were not basically understood or expected by these sentencing guidelines in factoring this sentence and deviating from the guideline range.

Counsel argues there's no expectation this would happen. She had an expectation she would be able to care for the victim. I don't see how that could possibly be true.

The defendant claims she was awake for several days before this. All the more reason, just being exhausted[,] in and of itself[,] put you in a position where you could not care for this child adequately[,] let alone being on meth and/or coming off of meth. The sense of responsibility to the family would have been the first thing that told you to stay home.

\* \* \*

Once again, I've explained the reasons that I think departure[,] to some extent[,] from the guidelines is appropriate.

The trial court's articulated justifications for imposing an out-of-guidelines sentence on defendant amount, in summary, to the following: (1) OM's medical conditions were not adequately taken into consideration by the OVs; (2) defendant's education, training, and profession were not adequately taken into consideration by the sentencing guidelines; and (3) defendant's methamphetamine addiction—and her particularized knowledge about the risks of such an addiction as a medical professional—were not adequately taken into consideration by the sentencing guidelines.

Defendant's presentence investigation report states that, for the week before OM's death, defendant was high on methamphetamine while caring for OM, which defendant knew was inappropriate, but she "was trying to stay awake." To the extent that defendant's methamphetamine use was contemplated by the sentencing guidelines at all, it was incorporated into Prior Record Variable (PRV) 7, subsequent or concurrent felony convictions, MCL 777.57;

with an assessed 10 points for defendant's concurrent conviction of possession of methamphetamine. However, the sentencing guidelines do not otherwise contemplate an overnight nurse caring for a significantly at-risk patient while intoxicated on methamphetamine for a week. Defendant's addiction, education, training, and profession were not otherwise contemplated by any applicable OV or PRV.

A victim's vulnerability is normally contemplated by OV 10, exploitation of a vulnerable victim, MCL 777.40. However, OV 10 requires, in part, that the defendant "exploited" a victim's physical disability "for selfish or unethical purposes." MCL 777.40(2)(b). There is no indication in the record that defendant exploited OM for selfish or unethical purposes, rendering OV 10 inapplicable in this matter. Therefore, OM's extensive medical conditions were not contemplated by the sentencing guidelines. OM's vulnerability, as well as defendant's education and knowledge of her own drug addiction, combined to make defendant more culpable for her actions.

When applying the principle of proportionality and the factors articulated in *Dixon-Bey*, the trial court did not abuse its discretion by identifying these three matters as not otherwise being contemplated by the sentencing guidelines. See *Dixon-Bey II*, 340 Mich App at 298. The record supports that defendant was an experienced and educated medical professional, who wholly abandoned her responsibilities to her patient by using methamphetamine while caring for OM for the days preceding OM's death. Defendant disconnected and scattered OM's tracheostomy tube and connections to her ventilator, leaving OM unable to breathe because of her medical conditions, which caused OM's death. The record indicates that the trial court based its sentencing decision on the seriousness of the offense and the offender and articulated on the record why the upward-departure sentence was more proportionate than one within the calculated guidelines range. See *Steanhouse II*, 500 Mich at 472. The trial court did not abuse its discretion when it sentenced defendant above the recommended minimum sentence range.

Affirmed.

/s/ Noah P. Hood
/s/ Colleen A. O'Brien
/s/ James Robert Redford