# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ALLEN NATHANIEL THOMPSON,

        Defendant-Appellant.

UNPUBLISHED
August 15, 2017

No. 335399
Wayne Circuit Court
LC No. 16-000406-01-FJ

Before: SHAPIRO, P.J., and GLEICHER and O'BRIEN, JJ.

PER CURIAM.

Defendant appeals as of right his conviction of second-degree murder, MCL 750.317, for which he was sentenced to 20 to 35 years in prison. We affirm.

## I. FACTS AND PROCEEDINGS

Defendant's conviction arises from the shooting death of Ronald Ford III on August 23, 2015. Ford, a marijuana dealer, was shot and robbed of his marijuana during a transaction with defendant and codefendant, Travell Henry.

On the date of the offense, Henry and defendant were both residential students at the Job Corps campus in Detroit. Defendant was 16 years old. A security camera recorded them leaving the campus without permission by climbing over a perimeter fence on August 23, 2015 several hours before the shooting, and cell phone tracking demonstrated that they traveled to the east side of Detroit. Text messages between Henry and Ford were consistent with planning a drug transaction. In a statement to the police, defendant admitted that he and Henry surreptitiously left the campus in order to meet Ford to purchase marijuana but denied planning to rob or kill Ford.

Ford was fatally shot inside his vehicle during the transaction. Two backpacks and marijuana were taken from Ford's vehicle after he was shot. After the offense, Henry contacted a friend, Brandy Hill, who drove Henry and defendant back to the Job Corps campus. The security camera recorded them returning with the backpacks. Defendant was charged with first-degree felony murder, MCL 750.316(1)(b), and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Henry was tried separately and convicted of first-degree felony murder. Defendant's first trial ended in a mistrial after the jury was unable to

-1-

reach a verdict. At defendant's second trial, the jury acquitted him of first degree felony murder and felony-firearm, but it convicted him of the lesser included offense of second-degree murder.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that the evidence was insufficient to convict him of second-degree murder.[1] "In determining whether the prosecutor has presented sufficient evidence to sustain a conviction, an appellate court is required to take the evidence in the light most favorable to the prosecutor." *People v Pinckney*, 316 Mich App 450, 467-468; 891 NW2d 891 (2016) (citation and quotation marks omitted). "All conflicts in the evidence must be resolved in favor of the prosecution." *People v McRunels*, 237 Mich App 168, 181; 603 NW2d 95 (1999).

Preliminarily, defendant suggests that the jury's verdict is inconsistent because the jury acquitted him of felony murder,[2] which was predicated on the commission of a murder during the commission of a robbery, and it also acquitted him of felony-firearm. Defendant contends that the verdict raises the question of how he could have acted in concert with Henry to commit murder if there was no prior understanding between them that Henry would rob Ford. As a general rule, however, a seemingly inconsistent verdict, does not, in and of itself, entitle defendant to relief. A jury is permitted to enter an inconsistent verdict. *People v Ellis*, 468 Mich 25, 26; 658 NW2d 142 (2003); *People v Vaughn*, 409 Mich 463, 466; 295 NW2d 354 (1980). Thus, the real question before us is not whether the jury's verdict appears inconsistent; it is whether the evidence supports the elements of second-degree murder, either under a theory that defendant shot Ford or that defendant participated in the offense with the requisite malice to be guilty under an aiding or abetting theory.[3]

The elements of second-degree murder are "(1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Goecke*, 457 Mich 442, 463-464; 579 NW2d 868 (1998). To convict a defendant under an aiding or abetting theory, the prosecution must prove that (1) the defendant or some other person committed the crime, (2) the defendant performed acts or gave encouragement to assist the commission of the crime, and (3) the defendant intended the commission of the crime or knew that the principal intended its

---

[1] We review a challenge to the sufficiency of the evidence de novo. *People v Pinckney*, 316 Mich App 450, 467; 891 NW2d 891 (2016).

[2] "The elements of felony murder are (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b)." *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009).

[3] "Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may . . . be prosecuted . . . tried and on conviction shall be punished as if he had directly committed such offense." MCL 767.39.

commission when giving aid or encouragement. *People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006). Significantly, under *Robinson*, the third element may be established by proof that the charged offense was 'the natural and probable consequences of the offense [the defendant] specifically intended to aid or abet." *Id*. at 15.

There was sufficient evidence that defendant participated in an armed robbery in which murder was a natural and probable consequence. It does not appear to be disputed that defendant and Henry surreptitiously left the Job Corps campus together and that they met at a location near defendant's mother's house. Testimony was offered by an eyewitness that the armed robbery was committed by two men wearing clothes consistent with what Henry and defendant were wearing and, as noted, defendant did not dispute that he was present. There was also evidence that defendant had access to the type of firearms that were used to kill Ford and that Henry and Ford were friends. Hill, who provided the ride back to the campus, testified that it was defendant who was carrying the black backpack when she met defendant and Henry shortly after the offense, and surveillance video from Job Corps showed that it was defendant who threw the backpack over the fence when he and Henry returned to the Job Corps campus. After the offense, defendant and Henry fled together, and defendant allowed Henry to use defendant's cell phone to contact Hill to obtain a ride back to the Job Corps campus. While in Hill's presence, the two of them discussed a man getting shot. According to Hill, the demeanor of both men was "weird," and they both seemed "paranoid" when she drove past a police precinct.

Defendant gave a statement to the police in which he admitted that he and Henry were the only persons present when Ford was shot. From this, the jury could obviously infer that either defendant or Henry shot Ford. Defendant told the police that it was Henry who was armed with a gun when the shots were fired, but the jury was free to conclude that this statement was untruthful. Defendant's conduct and continued association with Henry after the shooting also supported an inference that he was not surprised or upset that Ford was shot. Defendant did not report the incident to the police or to anyone at Job Corps, suggesting that he was not an unwilling bystander. Defendant carried the stolen backpack containing the marijuana and scale, and defendant received some of the stolen marijuana. All of these circumstances support an inference that defendant acted in concert with Henry, that he helped and encouraged Henry by choosing a location where he and Henry could flee after dealing with Ford and by approaching Ford's car with Henry, and that defendant's and Henry's conduct and joint actions showed that they shared a common intent. Thus, even if the jury concluded that Henry was the shooter, there was sufficient evidence from which a rational jury could convict him on an aiding and abetting theory as defined by *Robinson*. Under *Robinson*, the prosecution did not need to present evidence that defendant specifically intended to aid and abet Henry in shooting Ford. *Robinson*, 475 Mich at 15. Rather, it was required to present sufficient evidence that the murder of Ford was a natural and probable consequence of the offense that defendant did intend to aid or abet. *Id*. It did so, and thus the verdict was not improper.

## III. ADMISSION OF PHOTOGRAPHS AND VIDEO

Defendant next argues that the trial court erred by admitting two Facebook photos showing him holding a gun in each hand. These photos were posted to defendant's Facebook page on August 1, 2015, approximately three weeks before the charged offense. Defendant also challenges the admission of a video from his cell phone, which depicted a condominium kitchen

with a gun on the countertop. Defendant argues that these exhibits were irrelevant under MRE 401 and 402. He alternatively argues that, to the extent these items were relevant, they should have been excluded under MRE 403 because the potential for unfair prejudice outweighed the probative value of the evidence.[4]

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *People v Bergman*, 312 Mich App 471, 483; 879 NW2d 278 (2015); MRE 401. Generally, "[a]ll relevant evidence is admissible, except as otherwise provided" by law, and irrelevant evidence is inadmissible. MRE 402. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." MRE 403. "Unfair prejudice exists only where either a probability exists that evidence which is minimally damaging in logic will be weighed by the jurors substantially out of proportion to its logically damaging effect, or it would be inequitable to allow the proponent of the evidence to use it." *People v Murphy (On Remand)*, 282 Mich App 571, 583; 766 NW2d 303 (2009) (citations and quotation marks omitted).

The Facebook photographs and video from defendant's cell phone were relevant because they showed that defendant had access to the type of weapon used to kill Ford. Given that no weapons were ultimately recovered and that there was no other evidence suggesting that defendant or Henry had access to the weapons used in the offense the probative value was especially strong. The evidence was in no way cumulative, and it directly tended to prove the fact for which it was offered, to show defendant had access to a weapon. *See People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008) (stating that "[a]ssessing probative value against prejudicial effect requires a balancing of several factors, including . . . whether the evidence is needlessly cumulative [and] how directly the evidence tends to prove the fact for which it is offered"). Defendant argues that the photos were unfairly prejudicial under MRE 403 because they "portrayed him as a gangster." However, we conclude that any risk of prejudice caused by the admission of these photographs and the video was minimal in comparison to the strength of their probative value. Although defendant is holding guns in the Facebook photos, he is not demonstrating any intent to use the guns. He is not holding the gun in the video. Therefore, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. Defendant has not established that the trial court abused its discretion in admitting this evidence.

IV. ADMISSION OF DEFENDANT'S STATEMENT

Defendant next argues that the trial court erred in denying his motion to suppress his August 27, 2015 statement to Officers Steven Ford and Laura Manzella. Defendant argues that the statement should have been suppressed because the officers continued to question him after

---

[4] We review a trial court's decision to admit evidence for an abuse of discretion. *People v Mardlin*, 487 Mich 609, 614; 790 NW2d 607 (2010). An abuse of discretion occurs if the trial court's decision "is outside the range of reasonable and principled outcomes." *People v Orr*, 275 Mich App 587, 588-589; 739 NW2d 385 (2007).

he requested an attorney. We have reviewed the video recording of the relevant interchange and conclude that defendant knowingly and voluntarily waived his right to counsel. "The Fifth Amendment and Const 1963, art 1, § 17 provide that no person shall be compelled to be a witness against himself in a criminal trial." *People v Schollaert,* 194 Mich App 158, 164; 486 NW2d 312 (1992). "The Fifth Amendment privilege has been extended beyond criminal trial proceedings 'to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves.' " *Id.* at 164, quoting *Miranda v Arizona*, 384 US 436, 467; 86 S Ct 1602; 16 L Ed 2d 694 (1966). "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 US at 444. "The right to have counsel present during custodial interrogation is . . . a corollary of the right against compelled self-incrimination, because the presence of counsel at this stage affords a way to 'insure that statements made in the government-established atmosphere are not the product of compulsion.' " *People v Tanner,* 496 Mich 199, 207; 853 NW2d 653 (2014), quoting *Miranda*, 384 US at 466.

In *People v Adams*, 245 Mich App 226, 237-238; 627 NW2d 623 (2001), we summarized the principles pertaining to a suspect's request for counsel during custodial interrogation:

> In *Edwards v Arizona,* 451 US 477, 484-485, 101 S Ct 1880, 68 L Ed 2d 378 (1981), the Supreme Court held that when an accused invokes the right to have counsel present during a custodial interrogation, the accused is not subject to further interrogation by the police until counsel has been made available, unless the accused initiates further communication, exchanges, or conversations with the police. The Supreme Court in *Davis v United States,* 512 US 452, 114 S Ct 2350, 129 L Ed 2d 362 (1994), further clarified *Edwards* and stated that courts must determine whether the accused actually invoked the right to counsel and that this constitutes an objective inquiry. *Id.* at 458-459. Thus, invocation of the *Miranda* right to counsel requires a statement that can reasonably be construed to be an expression of a desire for the assistance of counsel. [*Id.* at 459.] If the accused makes a reference to an attorney and the reference is ambiguous or equivocal in that a reasonable police officer in light of the circumstances would have understood only that the accused might be invoking the right to counsel, the cessation of questioning is not required. *Id.* Thus, the Supreme Court summed up its holding as, "after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." [*Id.* at 461.]

At the beginning of the police questioning, which was scheduled at defendant's request, defendant indicated that his mother might come with an attorney, but he did not know if she would. Officer Ford asked defendant if he was "saying you don't want to talk to us without a lawyer," and told defendant, "It's up to you." Ford then gave defendant and opportunity to call his mother. Defendant talked to his parents, and specifically asked his mother if she was getting an attorney. A man, presumably defendant's father or stepfather, told him not to say anything "extra," and then Officer Manzella sought confirmation whether defendant was "okay to talk to us?" Ford then read defendant his rights, including the advice that he could decide at any time that he wanted a lawyer. Defendant read the waiver of rights form aloud. Defendant said

nothing that could be construed as a request for counsel. Defendant apparently intended to rely on his parents' guidance, and he opted to speak to the officers without counsel present based on his parents' statements. Nothing in the recorded interview suggests that the officers tried to influence defendant's decision or that defendant was somehow prevented from making an unequivocal assertion of his right to counsel. On the contrary, the officers gave defendant an opportunity to contact his parents to determine whether they had arranged for counsel to be present, and that conversation resulted in defendant opting to proceed without counsel. Therefore, the trial court did not err in denying defendant's motion to suppress his statement.

## V. INATTENTIVE JUROR

In his final issue, defendant argues that a new trial is required because a juror appeared to be asleep for part of the trial.[5] He also argues that defense counsel was ineffective for failing to move for a mistrial or request an evidentiary hearing to determine how much of the trial the juror may have missed.[6]

"An allegation of juror misconduct, even if the alleged misconduct did actually occur, will not warrant a new trial unless the party seeking the new trial can show that the misconduct [was] such as to affect the impartiality of the jury or disqualify them from exercising the powers of reason and judgment." *People v Dunigan,* 299 Mich App 579, 586; 831 NW2d 243 (2013) (citation and quotations omitted). Similarly, to establishing an ineffective-assistance-of-counsel claim, the defendant must show "that counsel's performance was deficient," and that "the deficient performance prejudiced the defense." *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984). A defendant must show that "but for counsel's deficient performance, a different result would have been reasonably probable." *People v Armstrong*, 490 Mich 281, 290; 806 NW2d 676 (2011), citing *Strickland*, 466 US at 694-696.

In *Dunigan*, we considered a defendant's entitlement to a new trial when a juror "had been observed to be sleeping." *Dunigan*, 299 Mich App at 586. We held that "[t]he trial court properly admonished the juror" and noted that "there is no indication of what, if any, testimony the juror missed." *Id.* In addressing the defendant's ineffective assistance of counsel claim, we held that the defendant "must at a minimum establish that any mistake made by counsel prejudiced the defendant, meaning there is a reasonable probability that the proceedings would have had a different outcome if counsel had not made the alleged error." *Id.* We concluded that

---

[5] A trial court's decision whether to grant a mistrial based on juror misconduct is generally reviewed for an abuse of discretion. *People v Messenger,* 221 Mich App 171, 175; 561 NW2d 463 (1997). In this case, however, defendant did not request a mistrial or otherwise object to the trial court's handling of the matter involving the juror, leaving this issue is unpreserved. We review an unpreserved claim of error for plain error affecting defendant's substantial rights. *Jackson*, 313 Mich App 409, 425; 884 NW2d 297 (2015).

[6] Because defendant did not raise an ineffective assistance of counsel claim in the trial court, our review of this issue is limited to mistakes apparent on the record. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012).

the defendant failed to satisfy this requirement because he failed to show "that the sleeping juror affected the outcome of the proceedings." *Id*.

The trial court in this case made more meticulous efforts to investigate the juror's perceived inattentiveness than in *Dunigan*. After inquiring about the juror's status, the trial court made detailed notes regarding instances when the juror rubbed his forehead, closed his eyes or looked downward, or failed to look at exhibits. The court informed the juror during trial that he needed to focus on the trial and give it "all hundred and ten percent," and the juror indicated that he understood. The trial court and the attorneys subsequently agreed that the juror appeared more attentive. As in *Dunigan*, 299 Mich App at 586, "there is no indication of what, if any, testimony the juror missed." These circumstances preclude any inference that defendant was prejudiced by the juror's perceived inattentiveness or trial counsel's failure to move for a mistrial or pursue other action.

Affirmed.

/s/ Douglas B. Shapiro
/s/ Elizabeth L. Gleicher
/s/ Colleen A. O'Brien