*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ALICIA MICHELE WRIGHT,

        Defendant-Appellant.

UNPUBLISHED
October 15, 2020

No. 348900
Kent Circuit Court
LC No. 18-002188-FC

Before: LETICA, P.J., and K. F. KELLY and REDFORD, JJ.

PER CURIAM.

Defendant appeals as of right her jury trial conviction of second-degree murder, MCL 750.317. She was sentenced to 14 to 25 years' in prison. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS

Defendant and the victim, Marcus Scott, Sr., were involved in a romantic relationship and lived in Greensboro, North Carolina in the fall of 2017. Defendant was 27-years old, and the victim was 42-years old. Despite the age difference, defendant thought that the victim was a good match for her because he cared for her two toddler children and was not abusive toward her. Because she lived in a high crime neighborhood, defendant agreed to move to Grand Rapids, Michigan with the victim after he received a job promotion in the area. In early November 2017, the couple resided in a three-bedroom home and occupied one bedroom. The victim's eldest son, MS, shared a bedroom with defendant's two toddler children, and the victim's son, JS, slept in the third bedroom.

After the move, defendant found work as a cook. MS took care of defendant's young children, and JS attended high school. MS testified that defendant began to change and suffered from severe mood swings. He believed that she was diagnosed with bi-polar disorder and attributed her behavioral changes to a failure to take her medication. Additionally, he testified that defendant consumed alcohol and smoked marijuana. As an example of her behavior, MS noted that defendant would become extremely angry at her toddlers when they failed to take naps.

Although MS could hear the couple argue, the victim did not assault defendant, but tried to calm her down when she was angry.

Defendant became frustrated with the couple's relationship. In her interview with the police, she disclosed that she gave her paychecks to the victim to cash because she did not have identification. After the victim cashed the check, he gave defendant an allowance of $100. Initially, defendant was satisfied with this arrangement because she had a "spending problem." However, after the victim began to make sexual requests that made defendant uncomfortable, she viewed the victim as controlling and resented his management of her finances. Additionally, defendant wanted to move back to North Carolina and needed her income to achieve that goal. Consequently, defendant advised the victim that she wanted to end their relationship and see other people. The victim purportedly agreed. Defendant acknowledged that the victim was not the type of person to evict defendant and her children from the home and put them on the street.

MS testified that, for two days, defendant was drinking and smoking marijuana around the children, and the victim repeatedly tried to calm defendant down. On January 9, 2018, MS was in his bedroom with the toddlers, and the couple occupied the adjacent bedroom. MS was talking on the telephone to a friend when he heard the couple arguing, pushing, shoving, and throwing stuff or knocking it to the floor. Specifically, defendant repeatedly demanded her money from the victim, cussed at him, and threatened to punch him in the face. The argument lasted for nearly an hour, and items were thrown for about ten minutes. Then, MS heard people running downstairs. He went to the couple's bedroom and found it in disarray. Additionally, MS tried to calm down the toddlers and get them back to bed. He also heard the victim try to quiet defendant down and deny taking her money. MS did not hear any further commotion, but looked outside and saw only defendant, not the victim. Back in his room, MS received a telephone call from the victim, and the victim asked him to call 911.

The neighbor heard the argument between defendant and the victim, but not the subject matter. Fifteen to twenty minutes later, he heard banging at his front door. He opened it to find the victim lying on the porch groaning and defendant talking on the telephone. In one hand, defendant held the handle from a knife, but she threw it off the porch into the flower bed. As defendant spoke on the phone, the neighbor overheard defendant state that she was done with the victim and that she stabbed him. He asked defendant where the victim was stabbed to try to stop the bleeding, but she did not answer. The neighbor turned the victim over and saw a lot of blood near the heart and chest area. The police arrived and took defendant into custody. The neighbor gave the police towels to try to stop the bleeding. Despite police and emergency personnel's efforts to revive the victim, he died on the porch.

When taken into custody, defendant made a statement to one of the arresting officers as well as detectives. Defendant's behavior in custody was consistent with the description given by MS; defendant would be calm in one moment, but could instantly change to angry the next moment. In her statement to the arresting officer, defendant said that the victim owed her money, but refused to give it to her to move back to North Carolina. They argued and the victim "got the best of" defendant, but she did not elaborate on what that statement meant. She also claimed that he "threw her around," noting that she was only 5'3" and 140 pounds while the victim was 6'1". Defendant said that she went downstairs and grabbed a knife. When the victim came toward her, defendant jabbed him. The victim pulled the knife out and broke it.

With regard to her statement to detectives, defendant initially stated that "[i]t was self-defense" and that she "stabbed him one time and didn't even wanna do it." Defendant advised that the couple were fighting in their bedroom. She admitted that the victim did not "punch" or "smack" her, and he never beat her.[1] However, in the bedroom, defendant claimed that the victim overheard her plans to meet a date that evening. Consequently, the victim pushed and threw her and tried to grab her phone. Defendant punched the victim twice. The victim picked defendant up off the floor and told her to calm down. Defendant managed to break free, went downstairs, picked up a knife, and told the victim to leave her alone, but he followed her outside. The victim was on the porch and defendant was two steps below when she stabbed him. Because the victim was wearing a shirt and thick coat, defendant did not believe that she actually stabbed the victim. However, the medical examiner testified that the wound path went through soft chest tissue into the cavity containing the left lung then through muscle to perforate a medium sized artery with a depth of perforation of 4 ½ inches.[2] Despite defendant's claim of self-defense, the jury convicted her as charged.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant first alleges that she acted in self-defense, and therefore, there was insufficient evidence to support her conviction of second-degree murder. We disagree.

A challenge to the sufficiency of the evidence is reviewed de novo on appeal. *People v Harverson*, 291 Mich App 171, 175-177; 804 NW2d 757 (2010). In reviewing the sufficiency of the evidence, this Court must determine whether, evaluating the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *People v Wolfe*, 440 Mich 508, 513-514; 489 NW2d 748 (1992). "Circumstantial evidence and reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of the crime." *People v Williams*, 268 Mich App 416, 419; 707 NW2d 624 (2005). All conflicts in the evidence must be resolved in favor of the prosecution, and the Court shall not interfere with the jury's determinations regarding the weight of the evidence and the credibility of the witnesses. *Wolfe*, 440 Mich at 515. "Intent may be inferred from all the facts and circumstances." *People v Cameron*, 291 Mich App 599, 615; 806 NW2d 371 (2011).

---

[1] In her statement to detectives, defendant repeatedly stated that the victim never physically harmed her. ("I finally found somebody [that] . . . cared for me and my kids and not put – he never put his hands on me. Like, we never fought. That wasn't us. He never was abusive or nothing." "No, he was attacking me. The thing about it, he didn't punch me or do none of that . . . ." "Like I said, he never punched me, slapped me or nothin'. It was more me bein' thrown around . . . .").

[2] The medical examiner also found that the victim suffered extensive injuries including multiple abrasions and bruises. He opined that the victim's injuries were recent and not in a state of healing. He agreed that the victim's injuries were indicative of having been in a scuffle or fight during which he was punched and had objects thrown at him. Defendant's only injuries were a small scratch to the back of her hand and a shin bruise.

"The elements of second-degree murder are: (1) a death, (2) the death was caused by an act of the defendant, (3) the defendant acted with malice, and (4) the defendant did not have lawful justification or excuse for causing the death." *People v Bergman*, 312 Mich App 471, 487; 879 NW2d 278 (2015) (quotation marks and citation omitted). "Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v Werner*, 254 Mich App 528, 531; 659 NW2d 688 (2002) (quotation marks and citation omitted). "Malice may be inferred from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm." *Id*. The prosecution need not prove that the defendant actually intended to harm or kill. *Id*. "Instead, the prosecution must prove the intent to do an act that is in obvious disregard of life-endangering consequences." *Bergman*, 312 Mich App at 487.

The evidence was sufficient to establish the elements of second-degree murder. Defendant admitted her verbal argument with the victim escalated to the point that she grabbed a knife and stabbed the victim, causing his death. See *People v Carines*, 460 Mich 750, 760; 597 NW2d 130 (1999). Further, defendant's act of grabbing the knife, brandishing it, and swinging it at the victim at close range established that she intentionally set in motion a force likely to cause death or great bodily harm that was in obvious disregard of the life-endangering consequences. See *Bergman*, 312 Mich App at 487. Accordingly, there was sufficient evidence from which a jury could conclude that defendant had the requisite malice for second-degree murder. See *Werner*, 254 Mich App at 531.

Nonetheless, defendant submits that her conduct was justified because she acted in self-defense, and the prosecutor failed to present sufficient evidence to rebut her claim. "In Michigan, the killing of another person in self-defense is justifiable homicide if the defendant honestly and reasonably believes that his life is in imminent danger or that there is a threat of serious bodily harm." *People v Heflin*, 434 Mich 482, 502; 456 NW2d 10 (1990); see also MCL 780.972(1)(a) (providing that a person may use deadly force against another if the person "honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual"). "Once evidence of self-defense is introduced, the prosecutor bears the burden of disproving it beyond a reasonable doubt." *People v Fortson*, 202 Mich App 13, 20; 507 NW2d 763 (1993). The reasonableness of a claim of self-defense when premised upon the weight and credibility of the evidence as well as the reasonable inferences arising therefrom present matters for the jury to resolve. *People v Anderson*, 322 Mich App 622, 632-633; 912 NW2d 607 (2018).

Defendant contends that the prosecution failed to meet the burden of rebutting her claim of self-defense because the victim intended on harming her in light of his continued pursuit of her even after she wielded the knife. She further argues that it made "no sense" that the victim pursued her to calm her down. However, at trial, MS testified that the victim allowed defendant and her children to move with them to Grand Rapids to pursue a better life. MS averred that the victim did not place his hands on defendant. Similarly, defendant acknowledged that she pursued a relationship with the victim and moved with him to Michigan because he never abused her and accepted her children. Even when describing the argument and physical altercation that led to the stabbing, defendant acknowledged that the victim did not strike her. Rather, she characterized his actions as essentially "moving" or "tossing" her, and she did not suffer documented injuries as a

result of his actions. Indeed, the victim did not respond in kind after defendant punched him. The jury was free to conclude that the victim followed defendant merely because of his belief that he could calm her down despite her acquisition of the knife. There was sufficient evidence from which a jury could conclude beyond a reasonable doubt that defendant was not in fear for her life or in fear of great bodily injury at the victim's hands. It was the province of the jury to weigh the evidence, make credibility determinations, and reject her assertion of self-defense. *Anderson*, 322 Mich App at 632-633. Accordingly, defendant is not entitled to appellate relief.[3]

## III. JUROR BIAS

Next, defendant submits that four allegedly biased jurors were allowed to remain on the jury panel and counsel's failure to challenge these jurors was objectively unreasonable. We disagree.

## A. BIAS

Defendant did not raise the juror selection or juror bias issue before the trial court. Unpreserved claims of constitutional error are reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 763. "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*.

To protect a defendant's right to a fair trial, "it is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *People v Johnson*, 245 Mich App 243, 256; 631 NW2d 1 (2001) (quotation marks and citations omitted). Jurors are presumptively impartial, and the party alleging the disqualification bears the burden of proving its existence. *Id*. Also, the jury is presumed to follow the instructions of the court. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998).

Waiver is the intentional relinquishment of a known right. *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000). Appellate relief may be foreclosed when there is an expression of satisfaction coupled with the failure to further question the jurors and seek disqualification. "In our view, granting defendant a new trial under these circumstances, where he (1) neglected to exercise challenges for cause, and (2) expressed satisfaction with the jury as impaneled, would be

---

[3] Defendant contends that, before sentencing, the trial court opined that she presented sufficient evidence that she acted in self-defense. However, our review of the sentencing transcript does not support that assertion. Rather, the learned trial judge expressed that defendant presented "a fairly credible argument for self-defense" and that counsel did "a very good job in presenting that case." The trial judge wisely distinguished the propriety and manner of the theory presented from the actual proofs. Indeed, before imposing sentence, the trial court expressed that defendant "did without justification kill a man, murder a man, and took away from these boys their dad and - - and took away from this man and a woman their son. So for that reason you . . . must stand and be held to account." This statement reflects an agreement with the jury verdict, not discontent.

tantamount to allowing defendant to build error into the jury selection process. This we will not do." *Johnson*, 245 Mich App at 253 n 3.

In *Johnson*, the defendant was denied a new trial despite the appeal of his conviction premised on juror bias. *Id*. at 252. The *Johnson* Court concluded that defense counsel's showing that a juror had been a victim of domestic violence and the same prosecutor's office was handling her ongoing case did not show sufficient bias to warrant appellate relief. *Id*. at 252-256. The juror did indeed disclose that she was the victim of an assault and did not knowingly give false or misleading answers. Moreover, the juror swore to keep her personal life separate and to be fair and impartial, and defense counsel did not question the juror further. *Id*.

In the present case, defendant challenges four jurors that were crime victims or had relatives that committed crimes. During voir dire, Juror Johnson stated that "[a] very long time ago, when I was three-years old, my father was killed by someone in a car." Juror Johnson said that "the only thing that I would take away from that experience with my father was that it was a very long time ago . . . [a]nd, I believe that I would be a fair and impartial juror regardless of—of what happened to my father." Juror Demarest stated during voir dire that her "father was shot and killed when [she] was 17." She noted that her father was living in Kentucky, and she was living in Michigan; she stated that she "wasn't very much involved in what happened in that situation down there." In response to questioning by the trial court if she could "sit today impartially without bias and give both the defense and the prosecution a fair shake," Juror Demarest stated, "I think so." She also affirmed that she could have an open mind about the case.

Juror Versluis stated that his son had been incarcerated "for four years for drugs." When asked if there was "[a]nything about his experience that would cause you difficulty being a juror in this case," Juror Versluis responded, "No." Juror Versluis believed that his son was "treated fairly during the course of his charging and prosecution." Juror Lubeck-Wanty stated during voir dire, "I was in Kent County Court when I was a child for—as a victim, that was there. No bias." Juror Lubeck-Wanty affirmed that there was nothing about that experience that would cause him difficulty in being an impartial juror.

All the jurors swore or affirmed that they would "justly decide the questions submitted to [them]" and that they would "render a true verdict" based "only on the evidence introduced and in accordance with the instructions of the Court." Furthermore, defense counsel expressly approved the panel of jurors, did not challenge these four jurors on any basis, and stated "we are satisfied."

We conclude that defendant waived this issue at the outset because defense counsel expressly approved the panel of jurors, exercised no challenges of any kind, and stated that "we are satisfied." Moreover, a review of voir dire revealed that defense counsel questioned the jurors as was deemed necessary. The jurors stated that they would be fair, impartial, and base their decision solely on the evidence. Jurors are presumed to follow the instructions of the court, and defendant has not proffered any evidence to suggest the jurors did otherwise. See *Graves*, 458 Mich at 486. This Court will only overturn a jury verdict in an extreme case of juror bias. See

*People v Skinner*, 153 Mich App 815, 819-820; 396 NW2d 548 (1986). Accordingly, defendant failed to demonstrate plain error affecting substantial rights.[4]

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Lastly, we reject defendant's contention that the failure to object to "biased" jurors constituted ineffective assistance of counsel.

"Whether a defendant received ineffective assistance of trial counsel presents a mixed question of fact and constitutional law." *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011). This Court reviews a trial court's factual findings for clear error and its conclusions of law de novo. *People v Miller*, 326 Mich App 719, 726; 929 NW2d 821 (2019). When no *Ginther*[5] hearing is held in the trial court, appellate review is limited to mistakes apparent on the record. *Id*. Because we denied defendant's request to remand to the trial court,[6] we are limited to record evidence.

"Criminal defendants have a right to the effective assistance of counsel under the United States and Michigan Constitutions." *People v Schrauben*, 314 Mich App 181, 189-190; 886 NW2d 173 (2016). To obtain a new trial premised on ineffective assistance of counsel, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012). It is presumed that defense counsel was effective, and a defendant must overcome the strong presumption that counsel's performance was sound trial strategy. *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). We do not second-guess counsel's strategic decisions with the benefit of hindsight. *People v Dunigan*, 299 Mich App 579, 589-590; 831 NW2d 243 (2013). "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). The burden of establishing the factual predicate for a claim of ineffective assistance is on the defendant. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

---

[4] In her appellate brief, defendant concludes that these four jurors were "biased." However, the jurors at issue disclosed their own victimization, the victimization of a family member, or a family member's commission of a crime. The jurors responded to further questioning by the court, the prosecutor, and defense counsel as was deemed appropriate. They gave assurances that they could be fair and impartial. Moreover, the voir dire demonstrates that when a juror gave ambiguous answers during a discussion of the presumption of innocence, defense counsel sought clarification to the extent the juror was "comfortable" disclosing, and she revealed her son's assault that resulted in his incarceration. Defendant's sole and entire appellate argument that "[d]efense trial counsel's failure to challenge these jurors, whose initial, and most reliable responses were that they 'thought' they could be impartial, was objectively unreasonable" is not supported by the record.

[5] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

[6] *People v Wright*, unpublished order of the Court of Appeals, entered January 7, 2020 (Docket No. 348900).

In *Johnson*, this Court rejected the claim of ineffective assistance of counsel premised on defense counsel's failure to make further inquiry of the juror. Rather, the *Johnson* Court concluded that the selection of the jurors was deemed a matter of trial strategy, the strategy was not viewed with the benefit of hindsight, and when a juror assured that he would be fair and impartial, there was no reasonable probability that the outcome would have been different. *Id*. at 259-260.

In the present case, defendant failed to establish that the jurors at issue were biased. Moreover, the decision to seat those jurors was a matter of trial strategy that we will not examine through hindsight. More importantly, the jurors gave assurances of fairness and impartiality, and therefore, defendant failed to meet her burden of demonstrating ineffective assistance.

Affirmed.

/s/ Anica Letica
/s/ Kirsten Frank Kelly
/s/ James Robert Redford