*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ROBERT LEE PARNEY,

        Defendant-Appellant.

UNPUBLISHED
September 2, 2021

No. 353354
Ottawa Circuit Court
LC No. 19-043045-FC

Before: RONAYNE KRAUSE, P.J., and BECKERING and BOONSTRA, JJ.

PER CURIAM.

Defendant appeals as of right his convictions by a jury of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(b) (sexual penetration with a blood relative or household member between the ages of 13 and 16); CSC-I, MCL 750.520b(2)(b) (sexual penetration of a person less than 13 years of age by a person 17 years of age or older); second-degree criminal sexual conduct (CSC-II), MCL 750.530c(1)(b) (sexual contact with a blood relative or household member between the ages of 13 and 16); and CSC-II, MCL 750.520c(2)(b) (sexual contact of a person less than 13 years of age by a person 17 years of age or older). The trial court sentenced defendant to concurrent sentences of 210 to 480 months' imprisonment, 300 to 900 months' imprisonment, 120 to 180 months' imprisonment, and 120 to 180 months' imprisonment, respectively. We affirm.

## I. BACKGROUND AND TRIAL

Defendant sexually assaulted the victim, his cousin, who turned fourteen years old a few days before trial, on multiple occasions when the victim was twelve and thirteen years old. The victim testified that she knew defendant as "Uncle Bob," and in 2018, he moved into the house in which the victim was living with her mother, her stepsister, and her stepfather. The victim initially regarded the situation as "awkward," in part because she did not previously know defendant. Their relationship was initially "a bit distant," but they became closer when defendant took up buying the victim gifts and taking her out to get breakfast in exchange for defendant touching the victim's vaginal area. The victim testified that defendant told her not to tell anyone else and that "adults would believe [him] over [her]." On one occasion, before the victim's thirteenth birthday,

-1-

defendant entered her bedroom, climbed into her bed, and got behind her. He then put his hand into her pants and inserted his fingers into her vagina. After he assaulted her, he said, "I swear, if this—if anyone finds thing—out about this, no one will believe you. And I'd probably kill myself before—and hurt you." The victim testified that this abuse continued after her thirteenth birthday and that defendant would use his tongue on her vaginal area, would watch her get dressed in the morning, and would frequently "cuddle" her in bed.

After the victim disclosed the abuse, Children's Protective Services (CPS) visited her home and referred her to the Children's Advocacy Center (CAC) of Ottawa County. CAC referred the victim to Dr. Yvonne Mallon, a pediatrician, for a medical forensic examination. Dr. Mallon was qualified as an expert in child abuse pediatrics with no objection. She testified that her procedure was to meet with children alone and ask them open-ended questions to obtain a medical history before conducting a physical examination, and she explained that both "medical history and physical examination is all important in diagnosis and treatment." Dr. Mallon testified that the victim was "very open" and told her the following during the pre-examination interview:

> She stated that three months prior to the examination that a person came into her room at night and—while she was sleeping, and she woke up to him putting her— his hands up her shirt, underneath her shirt, and touching her breast. She then stated to me that this person pulled down her pants and her underwear and touched her privates, which is what she referred to as her female genitalia; he touched her privates with his hands, and then he licked her privates with his mouth.

Dr. Mallon also testified that the victim said "that she tried to slap his head to stop it." Dr. Mallon explained that the physical examination only revealed "a non-specific finding," which she considered normal under the circumstances. On cross-examination, Dr. Mallon agreed that her findings could "neither confirm nor rule out" whether the victim had actually suffered any sexual abuse. Dr. Mallon did not offer any diagnosis, and she emphasized that she "can't say if [the victim] made it up or not." Pursuant to an earlier evidentiary ruling[1] by the trial court, Dr. Mallon did not state that the victim had identified defendant as "the person" who had assaulted her.

During opening statement, defense counsel told the jury, among other things, that defendant would testify that he moved into the house to help the victim's mother pay the rent and for other household expenses, and the situation appeared to be "going very well until he started telling [the victim's mother] that he was going to call Protective Services because it – that place was filthy" and lacked heat. Defense counsel also urged the jury to pay close attention to the recording of the police interview with defendant, which was in fact played for the jury. Defense counsel also emphasized that the timing of the victim's disclosure was suspicious and the victim's descriptions of what occurred were inconsistent with each other and with the evidence. On the

---

[1] Before trial, the prosecution moved to admit Dr. Mallon's testimony pursuant to MRE 803(4). After holding a hearing, the trial court ruled that the victim's statements describing the nature of the assault to Dr. Mallon were admissible as having been made for, and reasonably necessary to, the victim's diagnosis and treatment. However, the trial court also ruled that the "the victim's statement identifying defendant as her assailant was not necessary to her diagnosis or treatment," so that part of the victim's statement to Dr. Mallon would not be admissible.

last day of trial, after the prosecution rested, defense counsel explained to the trial court, outside the jury's presence, that he had "discussed this matter with my client; he's elected not to testify today." Defendant was placed under oath, and both the trial court and defense counsel explained to defendant that he had an absolute right to testify. Defendant confirmed that it was his own choice not to testify. The prosecution initially objected that because defendant did not testify, the defense had failed to present a witness referenced during opening statement. The prosecution requested, and was granted, an opportunity to research whether a limiting instruction would be appropriate.[2] However, after performing the requested research, the prosecution abandoned that objection.

A jury found defendant guilty as described earlier, and this appeal followed.

## II. ADMISSION OF DR. MALLON'S TESTIMONY

Defendant first argues that he was denied a fair trial when the trial court erred by improperly admitting Dr. Mallon's testimony pursuant to MRE 803(4). We disagree.

## A. STANDARD OF REVIEW AND PRINCIPLES OF LAW

The trial court ruled that Dr. Mallon's testimony was admissible at a pretrial hearing, over defendant's objections and argument. "We review preserved claims of evidentiary error for an abuse of discretion." *People v Bergman*, 312 Mich App 471, 482; 879 NW2d 278 (2015). "The decision to admit evidence is within the trial court's discretion and will not be disturbed unless that decision falls outside the range of principled outcomes." *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). "[A] preserved, nonconstitutional error is not a ground for reversal unless after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 496; 596 NW2d 607 (1999) (quotation marks and citation omitted). "A decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *Thorpe*, 504 Mich at 252. Conversely, it is necessarily "an abuse of discretion to admit evidence that is inadmissible as a matter of law." *Lukity*, 460 Mich at 488. Nevertheless, even if evidence is erroneously admitted, reversal will not be warranted if the erroneously-admitted evidence was harmless. *Id*. at 491-497.

Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). In general, hearsay is inadmissible. MRE 802. However, the Michigan Rules of Evidence provide exceptions that allow hearsay to be admissible. Relevant to this case, MRE 803(4) provides that statements made for the following purposes are admissible even if they would otherwise be excluded by MRE 802:

---

[2] This was presumably a reference to the general principle that, if a prosecutor promises during opening statement to produce evidence that is ultimately not presented, reversal may be warranted if the prosecutor's promise had been made in bad faith. See *People v Wolverton*, 227 Mich App 72, 75-77; 574 NW2d 703 (1997).

Statements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably necessary to such diagnosis and treatment.

In *People v Mahone*, 294 Mich App 208, 214-215; 816 NW2d 436 (2011), this Court considered the applicability of MRE 803(4) in the context of sexual assault examinations, and it explained:

Statements made for the purpose of medical treatment are admissible pursuant to MRE 803(4) if they were reasonably necessary for diagnosis and treatment and if the declarant had a self-interested motivation to be truthful in order to receive proper medical care. This is true irrespective of whether the declarant sustained any immediately apparent physical injury. Particularly in cases of sexual assault, in which the injuries might be latent, such as contracting sexually transmitted diseases or psychological in nature, and thus not necessarily physically manifested at all, a victim's complete history and a recitation of the totality of the circumstances of the assault are properly considered to be statements made for medical treatment. [Citations omitted.]

## B. ANALYSIS

As discussed, Dr. Mallon explained that taking a medical history from a victim was an important and standard part of her examination process. Furthermore, she explained that after the physical examination, she would either tell the child that injuries or abnormalities had been found, or she would "reaffirm to them that their body is okay and normal." Dr. Mallon also performed a swab of the victim to test for disease because the victim disclosed the assault to her. Therefore, the victim's statements were reasonably necessary for diagnosis and treatment of her injuries that were latent and not physically observable. See *Mahone*, 294 Mich App at 214-215. The victim's recitation of the totality of the circumstances of the assault, with the omission of any identification by the victim of the perpetrator, were properly considered to be statements made for medical treatment. See *id*.

Defendant relies on *People v Shaw*, 315 Mich App 668; 892 NW2d 15 (2016), for the proposition that MRE 803(4) does not permit an examiner's testimony about the complainant's statements when the complainant had only visited the examiner pursuant to a police investigation. In *Shaw*, 315 Mich App at 671, the victim, who was then 23 years old, reported that her stepfather had sexually assaulted her on multiple occasions when she had been between the ages of 8 and 16. After reporting the sexual assault to the police, the victim was referred to Dr. Stephen Guertin for a forensic physical examination. *Id*. at 674-675. Dr. Guertin testified at trial and recounted the victim's statements to him about the abuse. *Id*. The defense counsel did not object to Dr. Guertin's testimony and defendant appealed, arguing that he received ineffective assistance of counsel because Dr. Guertin's testimony was inadmissible hearsay and that MRE 803(4) did not apply. *Id*. at 674. This Court held that MRE 803(4) did not apply under those circumstances because the victim was not examined by Dr. Guertin until seven years after the last alleged instance of abuse, the victim did not seek Dr. Guertin out for gynecological services but was rather referred to

Dr. Guertin by the police in conjunction with an investigation, and the victim had already visited another gynecologist for treatment in the seven years between the last alleged instance of abuse and her visit to Dr. Guertin. *Id*. at 675-676.

However, *Shaw* is distinguishable from the present case. The *Shaw* Court did not rule that MRE 803(4) was not applicable on the sole basis that the victim had visited Dr. Guertin in connection with a police investigation; it also considered that the victim had visited other gynecologists for medical treatment and she did not visit Dr. Guertin until seven years after the last reported incident. Although the victim in this case was referred to Dr. Mallon after a consultation with CAC, she visited Dr. Mallon within three months after the last reported assault and there was no evidence to conclude that the victim had seen other treating physicians for a medical diagnosis related to the sexual assault.

Furthermore, "[t]he rationale for MRE 803(4) is the existence of (1) the self-interested motivation to speak the truth to treating physicians in order to receive proper medical care, and (2) the reasonable necessity of the statement to the diagnosis and treatment of the patient." *Id*. at 674 (quotation marks and citation omitted). Factors that may be part of a trustworthiness analysis include:

> (1) the age and maturity of the declarant, (2) the manner in which the statements are elicited (leading questions may undermine the trustworthiness of a statement), (3) the manner in which the statements are phrased (childlike terminology may be evidence of genuineness), (4) use of terminology unexpected of a child of similar age, (5) who initiated the examination (prosecutorial initiation may indicate that the examination was not intended for purposes of medical diagnosis and treatment), (6) the timing of the examination in relation to the assault (the child is still suffering pain and distress), (7) the timing of the examination in relation to the trial (involving the purpose of the examination), (8) the type of examination (statements made in the course of treatment for psychological disorders may not be as reliable), (9) the relation of the declarant to the person identified (evidence that the child did not mistake the identity), and (10) the existence of or lack of motive to fabricate. [*People v Meeboer*, 439 Mich 310, 324-325, 484 NW2d 621 (1992), (citations omitted).]

The victim was 13 years old when Dr. Mallon examined her and was capable of understanding the importance of disclosing her incident truthfully in order to receive proper medical care; Dr. Mallon testified that she asked the victim open-ended questions; the victim had phrased her statements to Dr. Mallon with terminology like "privates," which was consistent with the terminology of a child of a similar age; and, even though defendant states that the victim had a reason to lie, no motive was presented to establish that the victim was fabricating her statements to Dr. Mallon. "Although the prosecution initiated the examination and it may have been at least in part to investigate an alleged sexual assault, this factor is not dispositive." *People v Duenaz*, 306 Mich App 85, 96; 854 NW2d 531 (2014).

The factors and circumstances in this case support the admission of the victim's statements to Dr. Mallon under MRE 803(4). The trial court also considered all of these factors and circumstances. Therefore, trial court's decision to admit Dr. Mallon's testimony did not fall

outside the range of principled outcomes, and the trial court did not abuse its discretion. See *Thorpe*, 504 Mich at 252. In addition, we note that Dr. Mallon never purported to offer any kind of diagnosis, let alone a diagnosis based solely upon the victim's statements. Rather, Dr, Mallon emphasized that she did not know whether the victim was being truthful, it was not her role to make such an assessment, and no such assessment could be made from her physical findings. Cf., *People v Del Cid (On Remand)*, 331 Mich App 532, 542-551; 953 NW2d 440 (2020). Even if Dr. Mallon's testimony had been improperly admitted, we are not persuaded that it is "more probable than not" that her testimony affected the outcome of the proceedings. See *Lukity*, 460 Mich at 495-497.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant also argues that he received ineffective assistance of counsel when defense counsel promised, during opening statement, that defendant would testify, even though defendant never later testified. We disagree.

### A. STANDARD OF REVIEW AND PRINCIPLES OF LAW

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). We review the trial court's factual findings for clear error, and we review questions of law de novo. *Id*. "Clear error exists if the reviewing court is left with a definite and firm conviction that a mistake has been made." *People v Harris*, 261 Mich App 44, 51; 680 NW2d 17 (2004). "Defendant failed to preserve this issue by moving in the trial court for a new trial or an evidentiary hearing," *People v Head*, 323 Mich App 526, 538-539; 917 NW2d 752 (2018), or "by filing in this Court a motion for remand to the trial court for a [*People v*] *Ginther*[, 390 Mich 436; 212 NW2d 922 (1973)] hearing," *People v Abcumby-Blair*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 347369), slip op at p 8. "This Court reviews an unpreserved ineffective-assistance-of-counsel claim for errors apparent on the record." *People v Hieu Van Hoang*, 328 Mich App 45, 63; 935 NW2d 396 (2019).

To establish that defense counsel was ineffective, defendant must demonstrate that "(1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *People v Lockett*, 295 Mich App 165, 187; 814 NW2d 295 (2012); see also *Strickland v Washington*, 466 US 668, 689-696; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "In examining whether defense counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). "[A] court must determine whether the strategic choices were made after less than complete investigation, and any choice is reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. (quotation marks and citation omitted). A defendant may meet the burden of showing that a different result would have been reasonably probable, but for defense counsel's error, "even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Strickland*, 466 US at 694. "Where there is relatively little evidence to support a guilty verdict to begin with (e.g., the uncorroborated testimony of a single witness), the magnitude of errors necessary for a finding of

-6-

prejudice will be less than where there is greater evidence of guilt." *Trakhtenberg*, 493 Mich at 56 (quotation marks and citations omitted).

## B. ANALYSIS

Defendant relies on *United States ex rel Hampton v Leibach*, 347 F3d 219, 259-260 (CA 7, 2003); *McAleese v Mazurkiewicz*, 1 F3d 159, 166-167 (CA 3, 1993); and *Anderson v Butler*, 858 F2d 16 (CA 1, 1988), for the proposition that defense counsel may perform deficiently by promising in an opening statement more than they deliver at trial.[3] "[W]hen the failure to present the promised testimony cannot be chalked up to unforeseeable events, the attorney's broken promise may be unreasonable, for little is more damaging than to fail to produce important evidence that had been promised in an opening." *US ex rel Hampton*, 347 F3d at 257. This has been held to be especially true when it concerns defendant's own testimony:

> When a jury is promised that it will hear the defendant's story from the defendant's own lips, and the defendant then reneges, common sense suggests that the course of trial may be profoundly altered. A broken promise of this magnitude taints both the lawyer who vouchsafed it and the client on whose behalf it was made. [*Ouber v Guarino*, 293 F3d 19, 28 (CA 1, 2002).]

However, "only the most inexcusable [missteps] will support a finding that counsel's performance was so substandard as to compromise a defendant's . . . right to proficient legal representation." *Id.* at 27.

Defendant contends that there were no unforeseen circumstances that would have reasonably justified defense counsel's failure to fulfill the promise he made in his opening statement. We question the reasonableness of that assertion. The strong inference from the record is that defendant was expected to testify when defense counsel made his opening statement, and defendant made the unilateral decision not to testify at the end of the prosecution's case. As was explained to defendant, it was his right, and his right alone, to choose whether to testify. Defense counsel could not have forced defendant to testify. It is therefore questionable that the discrepancy between defense counsel's seemingly-reasonable expectations during opening statement and defendant's actual lack of testimony can be considered a "broken promise" entirely attributable to defense counsel. In stark contrast to the situation in this case, in *Ouber*, the petitioner's attorney advised the petitioner not to testify after having repeatedly "vow[ed] that the jurors would hear what happened from the petitioner herself." *Ouber*, 293 F3d at 27.

The question is therefore whether defense counsel provided ineffective assistance by predicting, during opening statement that defendant would testify. Arguably, counsel could not

---

[3] "While the decisions of lower federal courts and other state courts are not binding on this Court, they may be considered as persuasive authority." *People v Walker (On Remand)*, 328 Mich App 429, 444-445; 938 NW2d 31 (2019) (quotation marks and citation omitted); see also *Abela v Gen Motors Corp*, 469 Mich 603, 606; 677 NW2d 325 (2004) ("Although state courts are bound by the decisions of the United States Supreme Court construing federal law, there is no similar obligation with respect to decisions of the lower federal courts.").

technically promise that defendant would testify, because only defendant could decide whether he would testify, and he retained the right to make that decision through the end of the trial. However, again, the record strongly implies that it was reasonable at the time for defense counsel to have expected that his predictions about the testimony would prove accurate. Defendant has not, for example, provided evidence that defense counsel was aware that defendant had formed an intent not to testify at the outset of the trial, or that defendant was uncertain. As discussed, counsel is presumed to have pursued a sound trial strategy, which, under the circumstances, would entail counsel having told the jury that defendant would testify because, at the time, defendant did actually intend to testify. Decisions made by trial attorneys must be assessed for their reasonableness at the time, not with the benefit of hindsight. *Strickland*, 466 US at 690-691. Defendant has not overcome the presumption that defense counsel engaged in sound trial strategy at the time. See *Trakhtenberg*, 493 Mich at 52.

Even assuming that defense counsel's promise that defendant would testify was objectively unreasonable, defendant fails to articulate whether there was a reasonable probability that the result of the proceeding would have been different had defense counsel not made the promise. See *Lockett*, 295 Mich App at 187. In *Thompson v Rapelje*, 839 F3d 481, 485 (CA 6, 2016), the United States Court of Appeals for the Sixth Circuit held that the defendant was not prejudiced even though defense counsel's actions could have amounted to ineffective assistance, because the jury was shown a video recording of the defendant's police interview, in which the defendant denied the acts that made up his charged crime. Likewise here, even though defendant chose not to testify, the jury was still able to hear defendant's version of events, to some extent, from an interview that defendant had with Ottawa County Sheriff's Office Detective David Dewitt that was played for the jury and during which defendant said that the victim was "confused," she lied about things that she did, and she was frequently caught stealing. The jury also heard defendant tell Detective Dewitt that the only touching he did with the victim was when he hugged her. Additionally, the CPS investigator testified that defendant told her that he denied the sexual abuse of the victim.

Even though defense counsel did not address, in the closing arguments, that defendant did not testify at trial, the trial court instructed the jury that "[e]very [d]efendant has the absolute right not to testify. When you decide this case, you must not consider the fact that the defendant did not testify. It must not affect your verdict in any way."

Defendant contends that he was prejudiced by defense counsel's ineffective assistance because the trial was largely a credibility contest and the promise to hear testimony from him undermined his credibility when he did not testify. However, the jury heard testimony from the victim regarding the sexual assaults and threats that defendant subjected her to; from the victim's sister that corroborated the victim's testimony regarding defendant being on the bed and couch with the victim; from the victim's mother who testified that she witnessed defendant in the victim's bedroom with the victim; from the CPS investigator who testified that she was called to investigate a case of child sexual abuse and that defendant denied all accusations to her; and from Detective Dewitt who introduced the recording of his interview with defendant. Defendant did not offer any argument to demonstrate that the alleged prejudice from defense counsel's promise outweighed the great evidence of guilt in this case. See *Trakhtenberg*, 493 Mich at 56. Additionally, defendant offered no indication that defense counsel following through on his promise and having defendant testify would have aided his case given that, if he had testified, he would have been subject to potentially damaging cross-examination. Finally, the trial court properly instructed the jury that it

must not consider the fact that defendant did not testify. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003).

Therefore, there are no errors apparent on the record that suggest that defendant received ineffective assistance of counsel.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Jane M. Beckering
/s/ Mark T. Boonstra